CONTINENTAL ILLINOIS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CITIZENS AND SOUTHERN CORPORATION and SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Continental Illinois Corp. v. Commissioner
Docket Nos. 5931-83; 35465-86.
United States Tax Court
T.C. Memo 1988-318; 1988 Tax Ct. Memo LEXIS 346; 55 T.C.M. (CCH) 1325; T.C.M. (RIA) 88318; July 26, 1988. Edward C. Rustigan, Joel V. Williamson, Thomas C. Durham, and Roger J. Jones, for the petitioners. Cynthia J. Mattson and Grace Perez-Navarro, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: These cases involve deficiencies in the income taxes of two separate, affiliated groups of corporations. Both cases involve, among other matters, petitioners' entitlement to foreign tax credit for Brazilian taxes withheld on interest income received as a result of their loans to Brazilian borrowers. Pursuant to joint motions, the Brazilian foreign tax credit issue [1] was severed from the other issues *347 [2] and the cases were consolidated and tried at a special trial session in Washington, D.C., under the Court's expedited handling procedure. All of the loans at issue were net loans, [3] as was the common and accepted practice in Brazil during the years at issue (1978-1979 with respect to petitioner Continental Illinois Corporation and 1980-1982 with respect to petitioner Citizens and Southern Corporation and subsidiaries). A net loan is one in which the leader and borrower contractually agree that all payments of principal and interest will be made to the lender net of Brazilian *348 taxes. At all times involved herein, the borrower received a subsidy from the Brazilian government equal to a percentage of the taxes withheld. The issues for decision are: (1) whether petitioners are legally liable for Brazilian withholding taxes paid by the Brazilian borrower (the legal liability issue); and if so, then (2) whether such subsidy reduces the amount of the foreign tax credit allowable to petitioners pursuant to section 901[4] (the pecuniary benefit issue). *349 Respondent concedes that to the extent the Brazil foreign tax credits are disallowed, petitioners will be entitled to a correspondent reduction of their reported interest income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.
Continental Illinois Corporation
Continental Illinois Corporation (Continental Illinois) is a Delaware corporation which had its corporate headquarters in Chicago, Illinois, at the time it filed its petition herein. It filed consolidated Federal income tax returns on a calendar year basis for all relevant years with the Kansas City, Missouri Service Center. Continental Illinois National Bank and Trust Company of Chicago (CINB), a federally incorporated national banking association, is a wholly owned subsidiary of Continental Illinois. CINB regularly makes loans to a large number of borrowers located in foreign countries, including Brazil. The amounts of CINB's foreign tax credits at issue with respect to the legal liability issue and the pecuniary benefit issue are: Taxable
Legal Liability
Pecuniary Benefit
Year
Issue
Issue
1978
$ --       $ 518,431  1979
9,355,858
2,252,463
$ 9,355,858
$ 2,770,894
*350 For 1979, the $ 2,252,463 attributable to the pecuniary benefit issue is a portion of the $ 9,355,858 in dispute under the legal liability issue.
Citizens and Southern Corporation
The Citizens and Southern Corporation (C&S) is a Georgia corporation which had its corporate headquarters in Atlanta, Georgia, at the time it filed its petition herein. It filed consolidated Federal income tax returns on a calendar year basis for all relevant years with the Atlanta, Georgia Service Center. The Citizens & Southern National Bank (C&S Bank), a federally incorporated national banking association, is a wholly owned subsidiary of C&S. C&S Bank regularly makes loans to a large number of borrowers located in foreign countries, including Brazil. The amounts of C&S Bank's foreign tax credits at issue with respect to the legal liability issue and the pecuniary benefit issue are: Taxable
Legal Liability
Pecuniary Benefit
Year
Issue
Issue
1980
$ 201,441
$ 95,369 1981
219,216
61,599
1982
490,607
172,522
$ 911,264
$ 329,490
The amounts attributable to the pecuniary benefit issue are portions of the amounts in dispute under the legal *351 liability issue. Foreign Investments in Brazil
Brazil imposes restrictions on the receipt and exchange of foreign currency. Law No. 4,131 (enacted on September 3, 1962) established the basic rules for foreign investments in Brazil and the remittance of funds abroad with respect to such investments. By law, all loans from a foreign lender to a Brazilian borrower had to be approved by the Banco Central do Brasil (Central Bank) through a registration process. This registration process established the range of acceptable interest rates [5] and periodically established the minimum repayment terms of the loan. Once approval from the Central Bank had been obtained, the funds in foreign currency were remitted by the lender to the borrower via a commercial bank in Brazil, where the foreign currency was converted into Brazilian currency by means of an exchange contract. Through the exchange contract, the borrower sold the foreign currency to the bank for Brazilian currency at the official rate of exchange periodically set by the Central Bank. The borrower *352 received a Certificate of Registration that enabled the borrower to effect payment of interest and principal to the lender in the foreign currency in which the loan was made. At the payment dates, the borrower purchases the foreign currency from a Brazilian bank at the official exchange rate by means of an exchange contract. The foreign currency was then remitted to the lender by the Brazilian bank. During the years in issue, Brazil imposed a 25-percent withholding tax on interest paid to foreign lenders. Remittance abroad required proof of payment of any Brazilian tax which was due. Thus, in a situation involving a net loan, payment of the Brazilian tax due on the amount of interest remitted abroad would occur simultaneously with the payment of interest.
Payment of the Withholding Tax
Under Brazilian law, payments of tax (including the withholding tax on interest remitted abroad) are initiated by the submission of a Documento de Arrecadacao de Receitas Federais (DARF) and the accompanying payment of the tax due to a commercial Brazilian bank. The DARF is prepared by the person making the tax payment. Since Brazilian law prohibits transfers of foreign currency abroad *353 without proof of payment of the required tax, any bank making a payment of foreign currency abroad subject to Brazilian tax will require a completed DARF and payment of the tax as evidence that the proper amount of tax has been paid. [6]
Institution of the Pecuniary Benefit
Background
Under Decree-law 1,215, of May 4, 1972, the Brazilian Minister of Finance was given discretion *354 to grant a reimbursement or reduction of, or exemption from, the withholding tax due on interest on loans if there was a reduction of cost to the borrower and if the loan was considered to be of national interest and complied with other conditions set forth by the Ministry of Finance (such as minimum repayment terms). Decree-law 1,351, Article 9, of the October 24, 1974, authorized the National Monetary Council [7] to temporarily reduce the income tax on interest, commissions and expenses remitted to persons resident or domiciled abroad. On October 24, 1974 (the same day as Decree-law 1,251 was passed), the Central Bank issued Resolution 305, which temporarily reduced from 25 percent to 5 percent the income tax on interest, commissions and expenses paid on cash loans registered with the Central Bank. Decree-law 1,411 of July 31, 1975 amended Article 9 of Decree-law 1,351, and allowed the National Monetary Council to reduce the income tax on interest, commissions and expenses remitted to persons resident or domiciled abroad, or alternatively, to grant *355 pecuniary benefits to Brazilian borrowers of external financings for imports and loans in foreign currency. On August 5, 1975, the Central Bank issued Resolution 334 which revoked Resolution 305, thereby reinstating the 25-percent tax on interest, commissions, and expenses paid on cash loans registered with the Central Bank.
The Mechanics and Amount of the Pecuniary Benefit
On August 5, 1975, the Central Bank issued Resolution 335, which provided that borrowers taking out foreign loans duly registered with the Central Bank would receive a pecuniary benefit equal to 85 percent of the tax paid on the interest, commissions, and expenses payable on such loans. The resolution further provided that the Central Bank would issue regulations necessary for the implementation thereof. On the same day, August 5, 1975, the Central Bank issued Circular 266, which provided that: a. A DARF would be used for the payment of the 25-percent income tax on interest resulting from foreign currency loans; b. on the date of payment of the income tax, the banking establishment receiving the payment would, by means of a credit to the account of the borrower, pay to the borrower the equivalent *356 of 85 percent of the income tax; c. in the case of a loan under Resolution 63, the banking establishment receiving the foreign loan would be required to transfer the total value of the pecuniary benefit to the companies to which the funds had been repassed (defined infra), and in cases in which the foreign loan had been transferred to various repass borrowers, the pecuniary benefit would be transferred proportionally to each of such borrowers; d. the amount of the credit to the borrower would be debited to an account of the banking establishment entitled "Pecuniary Benefit - D.L. 1,411." On the same day as the payment of the tax to the Central Bank, the banking establishment would compensate the aforementioned balance against the Central Bank; and e. after verification that the DARF had been filled out correctly, the banking establishment would forward a copy of the DARF to the Central Bank. On July 26, 1979, the pecuniary benefit was reduced to 50 percent of the tax. On December 7, 1979, the pecuniary benefit was increased to 95 percent of the tax; on May 8, 1980, the pecuniary benefit was reduced to 40 percent of the tax; and on July 28, 1985, the pecuniary benefit *357 was reduced to zero.
Resolution 63 Loan
Many Brazilian companies needing working capital lacked credit to obtain a foreign loan. To provide Brazilian companies with the funds needed for their development, and in keeping with the Brazilian government's efforts to develop the country's economy and to generate foreign exchange, the Central Bank issued Resolution 63 on August 21, 1967. Through Resolution 63, banks in Brazil were permitted to borrow funds from abroad for the specific purpose of relending (repassing) the corresponding borrowed funds in Brazilian currency to Brazilian companies (repass borrowers). The charges to these repass borrowers by the Brazilian banks were the same as those charged by the foreign lender to the Brazilian banks except the loan was smaller in amount and shorter in duration. The loan between the foreign lender and the Brazilian bank was separate and independent of the loan between the Brazilian bank and the repass borrower. The foreign lender had no legal relationship with the repass borrower and in general did not know the identity of the repass borrower. Foreign loans contracted for the purpose of repass under Resolution 63 were subject *358 to the provisions of Decree-law 4,131.
Details of Repass Lending Under Resolution 63
Generally, the foreign lender was concerned only about the credit risk of the Brazilian bank. The initiative to borrow foreign funds for lending to local companies under Resolution 63 was that of the Brazilian bank, which would repass loans if and when local borrowers were available. In making loans under Resolution 63 to Brazilian banks, foreign lenders normally assumed that the Brazilian bank would pass on its cost of funds (the cost of the loan from the foreign lender) and charge a spread or commission to the repass borrower. The Brazilian bank was allowed to charge its borrower only a repass commission. The repass commission was usually calculated as a set percentage per year on the principal balance of the repass loan. The amount of the commission charged to the repass borrower was the same as that charged for other types of loans. During the year in issue, there was no limit on repass commissions, and the amount of the commission was as high as 10 percent, depending upon the credit of the individual repass borrower. All other financial conditions of the loan charged to the *359 repass borrower had to be the same as those between the foreign lender and the Brazilian bank. If the interest rage charged by the foreign lender to the Brazilian bank was net of the Brazilian withholding tax, then the interest rate payable by the repass borrower was likewise net of the Brazilian withholding tax. If the Brazilian bank was entitled to a pecuniary benefit, it passed on such benefit to the repass borrower. The transfer of the pecuniary benefit from the Brazilian bank to the repass borrower reduced the cost of the repass loan incurred by the repass borrower and thus encouraged foreign borrowing. Beginning in 1974, Resolution 63 funds not utilized in repass operations could be deposited with the Central Bank. When such funds were deposited, the Central Bank paid the interest on the foreign loan; and if there was a net loan involved, no withholding tax was paid with respect to the interest payment by the Central Bank.
Brazilian Tax Law
The Brazilian tax system is divided into three types of authority: the Federal Constitution, the National Tax Code, and ordinary Federal, state, and municipal legislation. The Federal Constitution of Brazil (Federal Constitution) *360 divides the authority to tax among the Federal government, the states, and the municipalities of Brazil. Pursuant to Article 21 of the Constitution, the Federal government has authority to impose all types of taxes, including a tax on income, except as otherwise granted by the Federal Constitution to the states or municipalities. The National Tax Code establishes the parameters within which the taxing authority of the Federal government, the states, and the municipalities may be exercised. It does not, in and of itself, create or impose any taxes.
The National Tax Code
Article 4 of the National Tax Code specifies that the legal nature of a tax is determined by its generating factor (that is, the taxable event); the name and other formal characteristics of the tax are irrelevant to the legal nature of the tax. Article 113 of the National Tax Code divides tax obligations into principal and accessory obligations. The principal obligation is created by the taxable event, and has as its objective the payment of the tax. The accessory obligation is derived from the tax legislation and has as its objective the performance of specific acts (e.g., maintaining books and records, *361 filing returns) in the interest of collection of the tax. The taxable event which gives rise to the tax on income is the economic or legal availability of such income. Under Article 45 of the National Tax Code, the person entitled to "the economic or legal availability of income" is called the "contribuente," or taxpayer. However, the status of the contribuente can be attributed to the holder of the assets producing the income or earnings. In addition, the source making payment of the income can be liable for the tax if such source is required by law to withhold and pay such tax to the Brazilian Treasury. Under Article 121 of the National Tax Code, the person obligated to make the payment of the tax is called the "passive subject" of the principal obligation. The passive subject of the principal obligation is either: (1) the contribuente, when he has a personal and direct relationship with the taxable event or (2) the responsavel (responsible or person liable) when, without having the status of a contribuente, he has an obligation to pay the tax by an express provision of law. Article 122 of the National Tax Code defines the passive subject of an accessory obligation as the *362 person obligated to perform the duties which comprise the accessory obligation. Article 123 of the National Tax Code specifies that, except as otherwise provided by law, private agreements concerning the liability to pay taxes are not binding on the public treasury. Article 128 of the National Tax Code provides that the liability for a tax claim may be assigned to a third party who is related to the taxable event which gives rise to the tax obligation.
Ordinary Federal Legislation
Since 1943, the Brazilian Federal government has provided for a withholding tax imposed on interest paid by Brazilian borrowers to foreign entities. The rates of withholding tax imposed on interest income paid by Brazilian borrowers to foreign lenders for the period from 1943 to the present are: Rate
Years
10%
1944-1947
15%
1948-1954
20%
1955-1958
25%
1959-1974
5% 1974-1975
25%
1975-Present
In order to compute the proper amounts of tax due when the tax payment was assumed by the Brazilian borrower (i.e., under a net loan), a gross-up adjustment was required. Thus, for example, if in a net loan situation, the borrower was required to pay the lender *363 $ 9 in interest net of Brazilian tax, and the tax rate was 25 percent, then the gross-up adjustment would be $ 3 so that the tax would be computed on an interest payment of $ 12 ($ 12 x 25% = $ 3).
Position of Parties
For tax purposes, each petitioner grossed-up the amount of interest received with regard to its net loans and claimed a foreign tax credit for the 25 percent withholding tax. In the notices of deficiency, respondent disallowed a foreign tax credit for that portion of the tax which was returned to the Brazilian borrower via the pecuniary benefit (i.e., the pecuniary benefit issue), and he correspondingly decreased the reported amount of interest income which was grossed-up. In his Answer to the Amendment to the Petition, respondent claims an increased deficiency on the basis that petitioners were not legally liable for the taxes paid by the Brazilian borrowers (i.e., the legal liability issue) and thus, respondent claims, no portion of the tax is creditable to petitioners.
Evidentiary Matters
Over petitioners' objections, respondent introduced into evidence copies of three communications -- a telegram, a telex and a letter -- between an official *364 of the American Embassy in Brazil and an official of the U.S. Treasury Department. [8] These communications dated December 10, 1974, August 1975 and September 1975, respectively, related to information concerning the 1975 Brazilian withholding tax increase from 5 percent to 25 percent and the simultaneous granting of a pecuniary benefit to the Brazilian borrower equal to 85 percent of the tax paid. Two of these documents contain alleged pertinent comments by a Brazilian finance official. The parties were requested to brief the question whether these documents constitute admissible hearsay under the Federal Rules of Evidence. All of the three documents are public records, reports, or statements within the purview of Rule 803(8) of the Federal Rules of Evidence.[9] The hearsay exception for public records, like other exceptions to the hearsay rule, is premised on the principles of necessity and trustworthiness. The primary purpose of each document was to report information in accordance with the author's employment duties. *365 We find each of the three documents in question to be trustworthy, and thus hold that they are admissible into evidence. We did not, however, use these documents as the basis for our decision since the result we reach herein is the same as that reached by us in Nissho Iwai American Corporation v. Commissioner,89 T.C. 765 (1987) (Nissho Iwai). *366 OPINION As we noted in Nissho Iwai, supra at pages 772-773 (1987): this case involves the unusual situation in which a taxpayer seeks to recognize income. The reason for this is because attached to the recognition of income is the potential availability of a foreign tax credit; and taxwise, the foreign tax credit is worth more than the detrimental recognition of the income. Pursuant to Section 901, a domestic corporation is allowed to claim as a credit against its Federal income tax (subject to certain limitations not herein applicable) the amount of any income taxes paid on behalf of the taxpayer to a foreign country. Sec. 4.901-2(a), Temporary Income Tax Regs., 45 Fed. Reg. 75647 (Nov. 17, 1980). [10]
*367 A foreign tax is creditable only if the taxpayer is legally liable under foreign law for the tax. Section 4.901-2(g), Temporary Income Tax Regs. Respondent claims that under Brazilian law, only the Brazilian borrower has legal liability for the Brazilian withholding tax on interest remitted abroad. Therefore, respondent argues, petitioners were not legally liable for the Brazilian withholding tax and thus such tax [11] is not creditable under section 901. We disagree. Respondent's position ignores the generating factor or taxable event which creates the Brazilian tax liability. In the transactions involved herein, the taxable event is the receipt of interest income; and it is the foreign lender, not the Brazilian borrower, which is the recipient of such income. The obligation placed on the Brazilian borrower to pay a withholding tax on interest remitted abroad is similar to the obligation placed on United States employers to pay a withholding tax on wages paid to their employees. In both situations, the person bearing the *368 onus of the tax is the one from whom the tax is withheld (i.e., the foreign lender with respect to the tax on wages). And, as we said in Gleason Works v. Commissioner,58 T.C. 464, 478 (1972): "The test does not rest upon a search from whom the tax is collectible but rather the person upon whom the tax is imposed." The Brazilian National Tax Code establishes parameters for all Brazilian tax statutes. Article 121 of the National Code provides that a tax statute may designate as the passive subject either the contribuente (the person who has a personal and direct connection with the taxable event of the tax) or the responsavel (the person who is made liable for the tax, even though he is not the contribuente). Here, petitioners were the contribuentes, and the Brazilian borrowers were the responsavels. The tax claim imposed on the Brazilian borrower by Article 128 of the National Code (the provision which places a legal duty on Brazilian borrowers) is merely the administrative mechanism which is used to collect the "principal tax obligation" placed upon the foreign lender as a result of the taxable event. That Article provides that liability for a tax claim may *369 be assigned to a third party who is related to the taxable event which created the corresponding principal tax obligation. Thus, Article 128 recognizes a distinction between the principal tax obligation which is created by the taxable event and a tax claim which arises after the creation of a principal tax obligation; such Article, in our opinion, relates solely to the responsibility for the payment of tax arising from a tax obligation previously incurred. Accordingly, we hold, as we held in Nissho Iwai, that the Brazilian withholding tax per se is potentially creditable. We now turn to whether the subsidy which the borrower received from the Brazilian government reduces the amount of foreign tax creditable pursuant to section 901. Respondent contends that if petitioners are legally liable for the Brazilian tax, then the amount of the creditable tax must be reduced by the subsidy (or pecuniary benefit) received by the Brazilian borrower. We agree. In Nissho Iwai, supra at page 777, we said: payment of the tax and receipt of the subsidy are in lockstep. Commonsense dictates that payment of the tax and receipt of the subsidy be viewed together in determining *370 the amount of foreign taxes creditable for purposes of section 901. If we accept payment of the Brazilian tax as one transaction and receipt of the subsidy as another, we would ignore the true unity of the transaction and elevate form over substance; this we shall not do. We believe that the 1975 pecuniary benefit legislation was devised to maintain for Brazilian net loan borrowers the economic benefits of the 1974 withholding tax reduction from 25 to 5 percent while restoring to foreign lenders the foreign tax credit benefits of a withholding tax rate of 25 percent. In the context of net loans, the 1975 pecuniary benefit legislation had the same economic effect as the 1974 tax reduction on both Brazilian borrowers and the Brazilian Treasury. Nor did the 1975 pecuniary benefit legislation change the pre-tax (U.S.) economic status of petitioners and other U.S. lenders with net loans. However, by providing inflated foreign tax credits for petitioners and other U.S. lenders, the 1975 pecuniary benefit legislation allowed petitioners and other U.S. lenders to benefit taxwise at the expense of the U.S. Treasury. The purpose of the foreign tax credit is to reduce international double *371 taxation. Nissho Iwai; see American Chicle Co. v. United States,316 U.S. 450 (1942). Here, disallowance of the pecuniary benefit portion of the tax does not subject petitioners to double taxation because the pecuniary benefit portion was not paid to the Brazilian Treasury. Following the enactment of the 1975 pecuniary benefit legislation, the Brazilian tax rate was in reality 5 percent, not 25 percent. Section 4.901-2(f), Temporary Income Tax Regs. (relating to the amount of income tax paid or accrued), provides: (f) Amount of income tax paid or accrued -- (1) In general. A credit is allowed under section 901 for the amount of income tax (within the meaning of § 4.901-2(a)(1)[12] that is paid or accrued to a foreign country, subject to the provisions of this paragraph (f). The amount of income tax paid or accrued is determined separately for each taxpayer. *372 * * * (3) Subsidies -- (i) General rule. An amount is not income tax paid or accured to a foreign country to the extent that -- (A) The amount is used directly or indirectly by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and (B) The subsidy is determined, directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer. (ii) Indirect subsidies. A foreign country is considered to provide a subsidy to a person if the country provides a subsidy to another person that -- * * * (B) Engages in a business transaction with the first person, but only if the subsidy received by such other person is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the first person with respect to such transaction. [45 Fed. Reg. 75653-75654 (Nov. 17, 1980).] In Nissho Iwai, supra at page 776, we stated: These regulations were promulgated under the Treasury's general rule-making power as authorized by section 7805(a). *373 As stated by the Supreme Court, Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." Commissioner v. South Texas Lumber Co.,333 U.S. 496, 501 (1948) and they "should not be overruled except for weighty reasons." Bingler v. Johnson,394 U.S. 741, 750 (1969). We recognize that the regulations involved are temporary, not final, regulations; nevertheless, we believe that they are entitled to the same weight as the final regulations.[16] See Zinniel v. Commissioner,89 T.C. 357 (1987). The position set forth in the temporary regulations, in our opinion, is not unreasonable. * * * The subsidy was paid to a person (e.g., the Brazilian borrower) engaged in a business transaction with petitioners and it was based on the amount of the Brazilian withholding tax. Pursuant to sec. 4.901-2(f)(3)(ii)(B), Temporary Income Tax Regs., the pecuniary benefit portion of the stated 25-percent *374 withholding tax constitutes an indirect subsidy. Accordingly, the pecuniary benefit portion is not creditable. Petitioners argue that a Resolution 63 loan is a three-party loan and therefore sec. 4.901-2(f)(3)(ii), Temporary Income Tax Regs., is not applicable to such a loan. We disagree. In a Resolution 63 lending transaction, there are two different agreements: one between the foreign lender and the Brazilian bank and another between the Brazilian bank and the repass borrower. Albeit the Brazilian bank borrowed from the foreign lender in order to repass such borrowed funds to the repass borrower, the foreign lender had no legal relationship with the repass borrower, and the loan to the Brazilian bank was based solely on the Brazilian bank's creditworthiness. In fact, the foreign bank typically did not know the identity of the repass borrower. Although the Brazilian bank transferred a pro rata portion of the subsidy to which it was entitled to the repass borrower, it did so because pursuant to Resolution 63 the Brazilian bank was allowed to charge the borrower only a repass commission. All other financial conditions of the loan charged to the repass borrower had to be the *375 same as those between the foreign lender the the Brazilian bank. Since the subsidy reduced the Brazilian bank's costs, the Brazilian bank was required to pass such savings on to the repass borrower. Both the payment of the tax with respect to the interest remitted abroad and the receipt of the subsidy by the repass borrower were inextricably linked to the transaction between the Brazilian borrower and the foreign lender. Hence, in our opinion, the provisions of sec. 4.901-2(f)(3)(ii)(B), Temporary Income Tax Regs., are applicable to Resolution 63 loans. This opinion resolves only the Brazilian foreign tax credit issue; all other issues not previously decided are still before the Court. Footnotes
1. Respondent has informed the Court that the Brazilian foreign tax credit issue is of industry-wide concern and that it is a significant issue because there are "several hundred million dollars of tax in dispute in scores of banking and non-banking cases pending in litigation and at various administrative levels with the Internal Revenue Service." ↩
2. With respect to petitioner Citizens and Southern Corporation and subsidiaries, an issue known as "Core Deposits" was tried before Judge William A. Goffe↩ at a special trial session in Atlanta, Georgia, under the Court's expedited handling procedure. 3. The typical language of a net loan is: All payments of principal and interest on this Note shall be made in lawful money of the United States of America, without set-off or counterclaim and free and clear of, and without deduction for (i.e., net of), any tax or other charge of any nature imposed on such payments by or within any jurisdiction or any political subdivision thereof, including any income, withholding or similar taxes of the Federal Republic of Brazil and any political subdivision thereof on or with respect to any such payment. The undersigned shall promptly furnish the Bank with all tax receipts for local income taxes. ↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
5. The rate allowed by the Central Bank was generally 2 to 2.5 points over LIBOR (London Interbank Offering Rate). ↩
6. The borrower must deliver a copy of the DARF and the registration certificate to the Brazilian bank (or U.S. branch bank) handling the payment of interest through a foreign exchange contract. The bank then records the amount of interest and tax on the Certificate of Registration and submits the certificate, exchange contract and DARF to the Central Bank for approval. Upon approval by the Central Bank, the bank remits the interest to the foreign lender and returns to the borrower a stamped copy of the DARF, the Certificate of Registration (stamped) and a copy of the exchange contract. The borrower then sends a copy of the DARF to the foreign lender which then has proof (the DARF) that the withholding tax was paid. The lender performs no act in Brazil for the collection of tax.↩
7. The National Monetary Council is a government agency responsible for economic programs. It acts through the Central Bank. ↩
8. The Treasury official, Nathan Gordon, died in 1976. See Rule 804(a)(4) and (b)(5) of the Federal Rules of Evidence.↩
9. RULE 803. Hearsay Exceptions; Availability of Declarant Immaterial The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * * (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil action and proceedings against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness. ↩
10. In November 1980, the Internal Revenue Service issued temporary regulations which set forth requirements for, and limitations on, the amount of foreign tax credit. These temporary regulations, sec. 4.901-2 et seq., generally were made applicable to taxable years ending after June 15, 1979. Final regulations under sec. 901↩ were made effective for taxable years beginning after Nov. 14, 1983. 11. We recognize that withholding is merely a system for collecting a type of tax (such as an income tax) and the "withholding tax" is not a tax per se. ↩
12. Section 4.901-2(a)(1) provides: (a) Definition of income, war profits, or excess profits tax -- (1) In general,Section 901 allows a credit for the amount of any income, war profits, or excess profits tax ("income tax") paid or accrued by or on behalf of the taxpayer to any foreign country. Whether a charge imposed by a foreign country ("foreign country") is an income tax is determined independently for each separate foreign charge. Each separate foreign charge will be considered either to be an income tax or not to be an income tax, in its entirety, for all persons subject to the charge. The standard for determining whether a foreign charge is an income tax is the U.S. income tax. Thus, a foreign charge is an income tax if and only if -- (i) The charge is not compensation for a specific economic benefit within the meaning of paragraph (b) of this section; (ii) The charge is based on realized net income within the meaning of paragraph (c) of this section; and (iii) The charge follows reasonable rules regarding source of income, residence, or other bases for taxing jurisdiction. A foreign charge may meet these requirements even if the provisions of the law of the foreign country ("foreign law") imposing the charge differ substantially from the income tax provisions of the Internal Revenue Code. A foreign charge does not follow reasonable rules of taxing jurisdiction if liability for the charge is clearly related to the availability of a credit for the charge against income tax liability to another country. [45 Fed. Reg. 75648↩ (Nov. 1980).] 16. It is to be noted that the final regulations ( sec. 1.901-2(e)(3), Income tax Regs.) provide that a subsidy accorded in connection with foreign taxes reduces the creditability of such taxes. ↩