CONTINENTAL ILLINOIS CORPORATION, also known as Continental Bank Corporation, Petitioner–Appellant, Cross–Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee, Cross–Appellant.

Nos. 92–2435, 92–3191.

United States Court of Appeals, Seventh Circuit.

Argued May 3, 1993.

Decided July 9, 1993.

---

Michael J. Waldman, Saul M. Shajnfeld, Bankers Trust Co., New York City, for Bankers Trust Co., amicus curiae.

Roger J. Jones (argued), Joel V. Williamson, Arthur I. Gould, Thomas C. Durham, Francis A. Lavelle, Mayer, Brown & Platt, Chicago, IL, Edward C. Rustigan, Winnetka, IL, Mary P. Taylor, Evanston, IL, for petitioner-appellee in No. 92–3191.

Abraham N.M. Shashy, Jr., I.R.S., Gary R. Allen, David E. Carmack, Charles Bricken (argued), James A. Bruton, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellant in No. 92–3191.

Before POSNER and COFFEY, Circuit Judges, and WILLIAMS, Senior District Judge.*

POSNER, Circuit Judge.

The Internal Revenue Service assessed substantial deficiencies against the Continental Illinois National Bank for the years 1975 through 1979. Continental challenged these deficiencies in the Tax Court, which conducted several trials that have produced the rulings, some in favor of Continental, some in favor of the IRS, that the parties have brought before us on this appeal and cross-appeal. 55 T.C.M. (CCH) 1325 (1991); 58 T.C.M. (CCH) 790 (1991); 61 T.C.M. (CCH) 1916 (1991). The parties and the amici have favored us with more than two hundred pages of briefs, rich in detail that we can ignore. The issues are straightforward. They concern just two types of loan: "net loans" made to foreign borrowers, and "CAP loans."

"Net loans" are loans net of any tax that the borrower's country imposes on the interest. In a gross loan, the parties agree to an interest rate, and the interest is paid to the lender subject to any obligation that local law imposes on the borrower to withhold the tax that the lender owes on the interest. Thus, if the agreed rate of interest is 12 percent and the withholding rate 25 percent, the borrower remits only 9 percent interest to the lender and pays the rest to the local

Roger J. Jones (argued), Joel V. Williamson, Arthur I. Gould, Thomas C. Durham, Francis A. Lavelle, Honey L. Goldberg, Mayer, Brown & Platt, Chicago, IL, Mary P. Taylor, Evanston, IL, for petitioner-appellant in No. 92–2435.

Gary R. Allen, David E. Carmack, Charles Bricken (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellee in No. 92–2435.

Michael M. Conway, Paul S. Caselton, John L. Snyder, Marilyn D. Franson, Hopkins & Sutter, Chicago, IL, for First Chicago Corp., amicus curiae.

* Hon. Spencer M. Williams of the Northern District of California, sitting by designation.

taxing authority. In a net loan, the parties agree upon the interest that the lender will be entitled to receive net of any local tax on it; this protects the borrower against an unexpected increase in the tax rate. Determination of the tax due on the interest for such a loan generally requires computing a grossed-up interest income figure (which we'll call x) that will generate the same amount of tax that would have been due had the form of the loan not been changed from gross to net. To compute x requires first computing what we will call r, the rate that, after subtraction of (in our example) 25 percent of the rate, equals the agreed-upon after-tax interest rate. So: $r - .25r = 9\%$; $r = 12\%$. The grossed-up income (x) is simply r times the amount of the loan. What we are calling x and r will nowhere be specified in the loan contract. They are artifacts created in order to make sure that net lending will not be used to reduce the lender's tax liability to the foreign country. In both the gross and the net loan the lender receives (in our example) 9 percent on his money after tax. The difference is that in the gross loan a change in the tax rate will raise or lower the amount of money the lender can take out of the country because his entitlement is to interest before the tax on it is computed or paid, and a change in the tax rate will therefore change what he can take out, while in a net loan a change in the tax rate will not affect the amount of money that he can take out of the country because the contract for such a loan entitles him to a fixed amount of interest over and above the local tax, whatever that tax may be.

The Internal Revenue Code allows a taxpayer to credit against the federal income tax that he must pay on income earned in a foreign country any income tax that he paid to that country on the same income. 26 U.S.C. § 901. In our example of a gross loan, the lender can thus set off the 3 percent interest that is withheld from his foreign interest income and paid over to the foreign taxing authority against his federal tax obligations. In the case of a net loan, however, for a long time either the IRS took the position, or Continental believed it was the IRS's position, that the only taxable income received by the lender was the agreed-upon after-foreign-tax rate; since no foreign tax had been taken out of *that* income, no foreign tax credit was available. In 1976 Continental learned that it was the IRS's position that the lender's taxable income was x, the grossed-up amount, and that any foreign tax paid on x could be taken as a foreign tax credit. Continental launched a study of all its net loans to determine how much foreign tax had been withheld, and it attempted to credit the amounts withheld against its federal income tax, restating its taxable income to include those amounts. In terms of our example, it reported x as taxable income and claimed a foreign tax credit of .25x. We shall see that this restatement promised Continental a net tax savings.

The first issue is whether Continental's inability to produce tax receipts for the amounts withheld is fatal to its claiming those amounts as foreign tax credits. Continental makes two arguments that it is not, one that the Tax Court correctly rejected, the other that it erroneously accepted. The first argument is that the foreign tax credit attaches irrevocably when the borrower (or other foreign debtor of the U.S. taxpayer) "withholds" for taxes moneys that would otherwise go to the lender (or other U.S. creditor), even if those moneys are never paid over to the foreign taxing authority. We disagree. Put aside the awkwardness that the "withholding" involves no subtraction from what would be due the lender were there no foreign tax, because the lender's entitlement is net of that tax. The important point is that it is a foreign tax credit that the Internal Revenue Code allows, not a foreign fraud credit. If Continental's position prevailed, American businessmen would have strong incentives to collude with foreign businessmen in overwithholding foreign taxes, since such overwithholding would generate foreign tax credits for the American at no cost to the foreigner. It is true that if the foreigner withholds more than is actually due (or collectable), pocketing the difference, the American will have a higher taxable income. But every extra dollar of taxable income will be creditable against U.S. income tax, and the result will be a net tax benefit. Suppose the American is in the 30 percent bracket.

Then the phantom additional dollar of foreign income will create a 30¢ tax liability and a $1 tax benefit, for a net benefit of 70¢.

This is reason enough why the IRS insists that the foreign tax not merely be withheld, but paid to the lawful taxing authority. And it is an insistence grounded in the language of the Internal Revenue Code. The amount allowed as a foreign tax credit is the amount of any foreign tax "paid or accrued," and if accrued taxes when paid differ from the amount of the credit taken that amount must be readjusted accordingly. 26 U.S.C. §§ 901(b)(1), 905(c).

█ Continental presented letters from its borrowers stating that they had indeed paid the taxes they withheld on Continental's net loans. These letters are the basis of its second argument, which the Tax Court accepted, that even if the foreign tax credit does not attach at the moment of "withholding," actual payment was adequately proved. The regulations require that the taxpayer submit "the receipt for each such tax payment," or in lieu thereof "a photostatic copy of the check, draft, or other medium of payment showing the amount and date thereof, with certification identifying it with the tax claimed to have been paid, together with evidence establishing that the tax was paid for taxpayer's account as his own tax on his own income." Treas. Reg. §§ 1.905–2(a)(2), 2(b)(1). The borrowers' letters did not comply with these straightforward requirements. We cannot imagine on what basis the requirements might be thought an abuse of the Internal Revenue Service's necessarily broad power to prescribe the methods of proving entitlement to lucrative tax benefits. Continental complains that the enforcement of the requirements against it is "unfair," because had it only realized before 1976 that net loans could generate foreign tax credits, it would have required its borrowers to furnish it with tax receipts. But that is tantamount to arguing that the IRS was under a judicially enforceable obligation, when it changed its position on the foreign tax credit status of net loans (*if* it changed its position—which is unclear, but also on the view we take of the case unnecessary to clear up), to relax its normal rules for proving payment of foreign

taxes so that taxpayers could take maximum advantage of the new position. In effect, by not relaxing its rules on proof, the IRS changed its position on the foreign tax credit status of net loans prospectively. Continental insists on full retroactivity. There is no basis in law, public policy, natural justice, or any other source of norms for such an insistence with respect to so artificial an entitlement as the foreign tax credit. Continental's argument is even weaker if there was no change in the IRS's position in 1976—if Continental just awakened then to the possibility of obtaining foreign tax credits for interest income on net loans. It would be remarkable for a corporate taxpayer to seek to shift to the Internal Revenue Service the burden of its own lack of diligence in exploiting opportunities for tax savings.

█ But Continental is on solid ground in arguing that if it is not entitled to the foreign tax credits, its taxable income on the net loans should be restated from (in our example) 12 to 9 percent. Had it not learned in 1976 that it could obtain foreign tax credits on the interest income generated by its net loans, it would have reported as taxable income merely the agreed-upon net interest rate. In 1976 it saw an opportunity to make money by increasing its reported income to the grossed-up level (x) and taking the difference as a foreign tax credit, since, as we have pointed out, reporting an extra dollar of income confers a net benefit on a taxpayer who can simultaneously claim an extra dollar of foreign tax credit. The attempt to take advantage of a lawful opportunity to save taxes failed because of difficulties of proof, and the logical, practical, and legal consequence is to return to square one, where Continental's taxable income is the interest it actually received. The tax years about which the parties are wrangling are "open," meaning that no final determination of Continental's tax liability for those years has been made; and there is no suggestion that a restatement of its interest income for those years would confer a windfall on Continental. It would be the tax equivalent of entrapment for the IRS, having in effect invited Continental to restate its net loan income in a form that would permit the bank to claim foreign tax

credits, now to insist on taxing the bank on a phantom income figure—the x rate that would have benefited Continental had its claim of foreign tax credits been accepted but that confers no benefit now that the claim has been rejected.

The IRS's argument that Continental has failed to prove that the foreign taxes were *not* paid (for if they were paid, then Continental's income really was x) is barred by the doctrine of judicial estoppel, which forbids a litigant to repudiate a legal position on which it has prevailed. It is true that the doctrine is usually applied to successive suits, *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1547–48 (7th Cir.1990), but it is not so limited. *Witham v. Whiting Corp.*, 975 F.2d 1342, 1345 (7th Cir.1992). A party can argue inconsistent positions in the alternative, but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory, which is what the IRS is seeking here. Having persuaded us to reject Continental's effort to show that the taxes were paid, the IRS may not argue against a restatement of income on the ground that they really *were* paid. Either they were or they weren't. If they were, Continental is entitled to a foreign tax credit, and if they weren't, it is entitled to restate its income to take the foreign taxes out.

The IRS argues in the alternative (!) that if the taxes were not paid, Continental's only remedy is to claim a bad-debt deduction against income in the year in which the borrower reneged on its implied obligation to pay the local tax on interest income earned by Continental. Such an implied obligation would arise if, should the borrower fail to pay the tax, Continental would be liable to the foreign taxing authorities, for if so the borrower is obligated to Continental to pay the local tax due on the interest income generated by the loan. But there is no indication that any such obligation either existed or was violated. The taxes may have been paid after all, or may never have been due, or, what the IRS itself treats as the same thing (Technical Advice Memorandum 86–17–003 (Dec. 30, 1985)), the tax law of the foreign country might not be enforced, or Continental may have borne no residual liability for the tax (the case in Brazil, as we are about to see). Judicial estoppel prevents our considering the first possibility; the others are ones in which there was (either de jure or de facto—and we have noted that the IRS treats these the same) no obligation to the foreign authorities, hence no implied obligation to Continental, hence no debt to go bad. We conclude that Continental is entitled to restate its income to take out the foreign taxes on which foreign tax credits were disallowed.

Net loans that Continental made to Brazilian borrowers raise a separate issue. Here Continental was able to satisfy the IRS that the local taxes really had been paid by the borrowers, but the IRS still refused to allow foreign tax credits, and this on two grounds. The first, which the Tax Court correctly rejected, is that under Brazilian law the tax is not on the lender at all, but, although called a withholding tax and computed on the basis of the lender's Brazilian income, on the borrower. The argument is semantic. Brazilian law makes the borrower exclusively responsible for paying the tax only in the sense that there is no remedy against the lender if the borrower fails to pay, whereas in some other countries the taxing authorities can go after the taxpayer himself if the employer or other withholder absconds. This is a distinction without a difference as far as foreign lenders to Brazilian borrowers are concerned. The Brazilian banking authorities will not allow a Brazilian borrower to buy foreign currency with which to pay interest to an American lender unless the borrower establishes that he has withheld and remitted the proper amount of taxes.

Naturally the Brazilian and American tax systems are not identical, but the differences between them with respect to withholding are too minor to justify a conclusion that Brazil is "really" taxing the borrower and not the lender. The essential similarity is that the tax is based on the income received by the lender. Such a tax is an income tax. Actually it is a gross-receipts tax rather than an income tax, because the cost of lending is not netted out of the interest received by the lender. But the IRS treats it as an income

tax, and the correct characterization is not important to this case. See Private Letter Rul. 76–1123–9900A (Nov. 23, 1976); 1 Joseph Isenbergh, *International Taxation* ¶¶ 18.4–18.7, 18.26–18.29, at pp. 497–502, 526–29 (1990). At all events, the tax is "paid" by the lender even if the borrower operates as his agent for payment and even if the tax enforcement guns are trained on the agent rather than on the principal. *Citizens & Southern Corp. v. Commissioner,* 919 F.2d 1492 (11th Cir.1990), affirming without opinion *Continental Illinois Corp. v. Commissioner,* 55 T.C.M. (CC) 1325, 1330, 1988 WL 75882 (1988); *Nissho Iwai American Corp. v. Commissioner,* 89 T.C. 765, 773–74, 1987 WL 45300 (1987).

■ The second ground for rejecting foreign tax credits on the Brazilian net loans, the ground the Tax Court correctly in our view accepted, is that beginning in 1975 the Brazilian government rebated most of the withheld taxes. (The part not rebated is entitled to foreign tax credit.) The year before, in an effort to stimulate foreign investment, the Brazilian government had slashed the tax rate on interest on foreign loans from 25 percent to 5 percent. This was fine for net loans, but had a boomerang effect on gross loans, though they were a distinct minority of all foreign loans. The tax cut increased the amount of foreign currency that the borrower had to buy to pay interest on a gross loan. Before on a 12 percent gross loan the borrower had paid 9 percent in foreign currency to the lender and the rest to the government in cruzeiros; now the borrower paid 11.4 percent (.12–.05(.12)) in foreign currency to the lender. So the following year Brazil passed a law restoring the 25 percent tax rate but rebating 20 percent to the borrowers, leaving the latter with a 5 percent effective tax rate. Continental claims to be entitled to treat the full 25 percent as a foreign tax that it can credit against its U.S. tax liability. The IRS argues that the 25 percent must be reduced by the rebate, so that the creditable tax rate is only 5 percent.

■ The IRS has two grounds, both accepted by the Tax Court, only one unsound. The unsound one is based on the principle of substance over form: an arrangement that has no rationale other than to beat taxes can be disregarded. *Yosha v. Commissioner,* 861 F.2d 494 (7th Cir.1988); *Bramblett v. Commissioner,* 960 F.2d 526, 533 (5th Cir. 1992). To rebate local taxes merely to generate foreign tax credits for a U.S. taxpayer to the ultimate benefit of the locals who do business with that taxpayer would qualify for the application of this principle. But as Continental points out, there is no evidence that this was the purpose of the rebate or the only effect. Brazil did want to preserve its stimulus for foreign investment yet stem a foreign-currency hemorrhage, and it chose a method of doing so that it might have chosen were there no U.S. foreign tax credit, for the rebate lowered the costs of Brazilian borrowers from foreign banks without increasing the amount of foreign currency that had to be paid those banks in the short run.

The other ground for knocking down the foreign tax credit to the post-rebate tax rate is Temp.Treas.Reg. § 4.901–2(f)(3), 45 Fed. Reg. 7563 (Nov. 17, 1980), 26 C.F.R. § 4.901–2(f)(3) (1981) (and, for Continental's 1978 taxable year, a revenue ruling to the same effect, Rev.Rul. 78–258, 1978–1 Cum. Bull. 239), which disallows foreign tax credit to the extent that the tax is used to subsidize the taxpayer. The temporary regulation is defunct, but its principle, and indeed virtually its exact words, have now been incorporated into the Internal Revenue Code. 26 U.S.C. § 901(i).

"Subsidy" is a tricky concept. It is by no means clear that the Brazilian tax rebate subsidized, in the sense of conferring an actual benefit upon, American net lenders like Continental. Joseph Isenbergh, "The Foreign Tax Credit: Royalties, Subsidies, and Creditable Taxes," 39 *Tax L.Rev.* 227, 244–47 (1984); 1 Isenbergh, *supra,* ¶ 18.10.2 at pp. 507–08. Indeed, insofar as the interest rate had been fixed in the loan contract before the rebate was instituted, only the borrowers benefited; for we noted at the outset that the difference between a net and a gross loan is that a net loan allocates the risk and benefit of any change in the tax rate to the borrower because the lender's return is specified net of tax. Even if not frozen by the contract the

interest rate might not rise by the amount of the subsidy. It is true that the subsidy would make the borrowers more eager to take out foreign loans and that an increase in demand usually results in an increase in price, but the increase in demand need not be proportionally equal to the increase in price and it would be tempered here by competition among the foreign lenders; also, Brazil imposed ceilings on interest rates. Figuring out who gets how much of the benefit of a subsidy is like figuring out who really pays a tax, since the nominal taxpayer has an incentive to shift it as best he can forward or backward. It all depends on contract terms and on conditions of demand and supply.

The IRS·regulation (now codified by Congress, as we noted) elides a difficult factual inquiry by deeming the taxpayer subsidized if the country subsidizes a person with whom the taxpayer "engages in a business transaction," provided the subsidy "is determined directly or indirectly by reference to the amount of income tax ... imposed by the country on [that] person with respect to such transaction." Temp. Treas. Reg. § 4.901–2(f)(3)(ii)(B). That description fits this case to a t. The borrower gets the subsidy, he engages in a business transaction with the U.S. taxpayer (the loan), and the subsidy is measured by the local tax on the U.S. lender's local income; it is 80 percent of that tax (20%/25%). The regulation is clear as a bell, and its validity cannot seriously be questioned, even if we disregard its later codification by Congress. Just as the IRS must be given leeway in deciding what proof to require that a tax has actually been paid, so it must be given leeway in deciding when a rebate to a foreign business partner of a U.S. taxpayer should be deemed a subsidy to the taxpayer, disentitling him to a foreign tax credit. The IRS can hardly be faulted for having chosen a bright-line approach in preference to interminable investigation of the mysteries of public finance, much as the latter approach might appeal to the legal, accounting, and economic-consulting communities. The Supreme Court has chosen a similar bright-line approach for resolving the analytically identical problem posed by the passing-on of price increases by antitrust plaintiffs. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). See also *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 46–47, 110 S.Ct. 2238, 2255, 110 L.Ed.2d 17 (1990).

We need not discuss separately the so-called "repass" loans, where the subsidy was paid not to the borrowers but to local banks with which Continental transacted—but the banks were required to pass the subsidy on to the borrowers. These loans fell within the letter as well as the spirit of the subsidy regulation. The statutory codification eliminates all possible doubt for the future. 26 U.S.C. § 901(i)(1).

The last issue we discuss is whether the Tax Court was correct to require Continental to report as income interest that the bank received subject to a contingent obligation to rebate it to the borrower. Beginning in 1972 Continental offered what it called "CAP" loans to some of its corporate borrowers. These loans usually had a fixed term of five to ten years. Interest, rather than being fixed in advance, was computed as a percentage of or over the prime rate. This floating rate was capped by a fixed rate specified in the loan contract, and Continental agreed that if at the expiration of the loan the borrower had neither defaulted on nor prepaid the loan Continental would refund any interest that it had received above the cap rate. When Continental received an interest payment that exceeded the cap rate (because the floating rate had floated above it), it reported only the cap rate as income. The excess it carried on its books "as interest collected but not earned." If it received an interest payment that was below the cap rate because the floating rate was below it, it would treat the payment as income, and if there was a balance in the borrower's "interest collected but not earned" account it would add to the interest payment that it had received so much of the balance in the account as necessary to equal the cap rate, and it would treat the sum as income, debiting the borrower's excess-interest account.

When Continental instituted its CAP loan program it thought the cap rate would on

average exceed the floating rate; it was offering the borrowers insurance rather than a lower expected price of money. But because of the unexpectedly steep inflation during the 1970s, the floating rate regularly pierced the cap, requiring Continental to make substantial refunds to its borrowers. It claims not to be required to treat any interest it received above the cap rate during the life of the loan as income, since such receipts were subject to a contractual obligation to be refunded at the expiration of the loan.

Not every receipt is income. A deposit, for example, is not. *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. 203, 110 S.Ct. 589, 107 L.Ed.2d 591 (1990); *Illinois Power Co. v. Commissioner,* 792 F.2d 683, 689–90 (7th Cir.1986). The recipient—bank, landlord, electric utility, whatever—holds the money under obligation (albeit defeasible) to return it. On the other hand income does not cease to be such because there is some likelihood that the recipient may have to give it back. For there is always *some* likelihood of that. The income that a seller receives from the sale of goods may have to be refunded because the goods were defective or the seller broke the contract of sale in some other way—and some sellers offer to take goods back and refund the buyer's money with no questions asked. A seller who offers a discount for customers who buy a minimum amount in the course of a year receives income from those customers subject to a contingent obligation to repay a portion to those customers who reach the minimum. Such contingencies have never been thought to entitle a seller to delay recognizing income until the time during which the contingencies could have materialized is past.

Ours is an intermediate case. The seller (here the lender) is not merely holding the money that he receives from the sale of his goods (or here the rent of his money) in the account of the buyer (borrower), as if it were a deposit; but the likelihood that he will have to repay much or even all of this "income" to the customers is substantial. There is no bright line that can be used for classifying such a case, and much therefore must be left to the Internal Revenue Service's discretion,

*Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 532–33, 99 S.Ct. 773, 780–81, 58 L.Ed.2d 785 (1979), not here abused. When Continental embarked upon its CAP loan program it expected to be able to keep the interest generated by the floating rate. The cap was for insurance. It was like a guarantee, specifically like a seller's promise to rebate a portion of the purchase price if the customer establishes that he could have bought the same good from another seller at a lower price. Guarantees of this sort resemble warranties against defective goods. They reduce the certainty of the seller's income stream but do not convert income into the equivalent of a deposit or a bailment.

No other issues need be discussed. The judgment of the Tax Court is affirmed in part and reversed in part, as indicated in this opinion, and the case is remanded to that court for such further proceedings as may be appropriate in light of this opinion.