**MENOMINEE INDIAN TRIBE OF WISCONSIN, Plaintiff,**

v.

**Tommy G. THOMPSON, Governor of the State of Wisconsin; George E. Meyer, Secretary, Wisconsin Department of Natural Resources; James T. Addis, Administrator of DNR Division of Resource Management; John E. Fryatt, Administrator of DNR Division of Enforcement; Herbert F. Behnke, Trygbe A. Solberg, Neal W. Schneider, Betty Jo Nelsen, Mary Jane Nelson, James E. Tiefenthaler, Jr. and Stephen D. Willett, Members of the Wisconsin Natural Resource Board, Defendants.**

No. 95–C–0030–C.

United States District Court, W.D. Wisconsin.

Feb. 26, 1996.

Bruce R. Greene, Greene, Myer & McElroy, P.C., Boulder, CO, for Plaintiffs.

Charles D. Hoornstra, Asst. Atty. General, Madison, Wisconsin, for Defendants.

## OPINION AND ORDER NO. 2

CRABB, District Judge.

Plaintiff Menominee Indian Tribe of Wisconsin brings this action for declaratory and injunctive relief, asserting that it enjoys off-reservation rights to hunt, fish and gather without state restriction on the lands it ceded to the United States in 1831, 1836 and 1848; that it has unextinguished aboriginal rights, derived from long uninterrupted use, to hunt and fish in various Wisconsin waters, including Lakes Winnebago and Michigan, the bay of Green Bay and portions of the Wisconsin River; and that it has the right to harvest Wolf River sturgeon in off-reservation, downstream portions of the Wolf River/Lake Winnebago ecosystem. Defendants have moved to dismiss the case on the grounds of failure to state a claim upon which relief can be granted, judicial estoppel and issue and claim preclusion. Defendants raised lack of subject matter jurisdiction as another ground for dismissal but plaintiff cured the problem by amending its complaint to delete any claim against the state of Wisconsin or the Wisconsin Natural Resources Board, both of which are immune from suit under the Eleventh Amendment.

With respect to counts I through V of the complaint, I conclude that plaintiff has alleged facts sufficient to state a claim, that questions of fact preclude a decision on defendants' motion to dismiss on the ground of judicial estoppel and that plaintiff's suit is not barred by the doctrine of nonmutual issue preclusion. With respect to the last claim relating to the sturgeon harvest, however, I conclude that plaintiff has failed to state a claim upon which it could obtain the relief it is seeking. Courts cannot rewrite treaties in the manner plaintiff has requested, which would permit the tribe to harvest sturgeon outside its reservation free of state regulation as an equitable accommodation for the manmade obstructions that prevent the sturgeon from reaching plaintiff's reservation. As to this count, defendants' motion to dismiss will be granted.

## FACTS ALLEGED IN COMPLAINT

Plaintiff Menominee Indian Tribe of Wisconsin is a federally recognized sovereign Indian tribe with a tribal government organized under the Indian Reorganization Act, 25 U.S.C. §§ 461–479, and the Menominee Restoration Act, 25 U.S.C. §§ 903–903f. The tribe is self-governing and has the capacity to regulate the usufructuary (hunting, fishing and gathering) activities of its members. It is suing for itself and its members.

Defendant Tommy G. Thompson is the governor and chief executive officer of the state of Wisconsin. He is named as representative of all legislative, executive, judicial and administrative bodies of the state and of all citizens of the state. Defendants Herbert F. Behnke, Trygbe A. Solberg, Neal W. Schneider, Betty Jo Nelsen, Mary Jane Nelson, James E. Tiefenthaler, Jr. and Stephen D. Willett are members of the Wisconsin Natural Resources Board, charged by state law with the direction and supervision of the Wisconsin Department of Natural Resources, or DNR. These defendants establish the administrative rules and policies through which the department carries out its natural resource management and regulatory pro-

grams. Defendant George E. Meyer is Secretary of the Department of Natural Resources and is responsible for the agency's management under state statutes and regulations. He is charged with supervising the department's natural resource management and regulatory programs. Defendant James T. Addis is Administrator of the department's Division of Resource Management and is responsible for planning and coordinating the development, protection and use of Wisconsin's forest, fish and wildlife resources through agency programs, policies and regulations. Defendant John E. Fryatt is Administrator of the department's Division of Enforcement and is charged with planning and directing a coordinated program of law enforcement encompassing all DNR enforcement activities.

From time immemorial, plaintiff and its members occupied the shores of Lake Winnebago and the shores and islands of Lake Michigan from the mouth of the Escanaba River to the mouth of the Milwaukee River, including all of Green Bay. This occupancy continued until well after the establishment of plaintiff's reservation in 1854. Plaintiff and its members hunted, fished and collected plant foods on Lakes Winnebago and Michigan.

For a number of years, defendants and their agents, employees, representatives and predecessors in office have adopted natural resource regulations and enforced them against members of the plaintiff tribe. Tribal members attempting to exercise their usufructuary rights on lands outside their reservation have suffered confiscation of personal property, the imposition of fines and other money penalties, the imposition of state license fees as a condition for exercising their usufructuary rights and have been subject to threats of such actions. Plaintiff and its members have been deterred and prevented from exercising their usufructuary rights for purposes of subsistence and commerce. As a result, their ability to earn a living from the natural resources outside their reservation has been disrupted and impaired.

The area within which plaintiff claims the right to hunt, fish and gather without state restriction is shown in Map 1 below.

Map 1.
Usufruct Claim of the Menominee Tribe
in the State of Wisconsin

The area in dispute does not include 1) any of the area plaintiff ceded to the United States for the benefit of the New York Indians in Article First of the Treaty of February 8, 1831, 7 Stat. 342, except for that portion of the ceded lands that is within the boundaries of the Menominee Indian Reservation; 2) any area ceded by the Chippewa Indians in the Treaty of July 29, 1837, 7 Stat. 536, or the Treaty of October 4, 1842, 7 Stat. 591; and 3) any area ceded by the Stockbridge–Munsee Indian Tribe in the Treaty of February 11, 1856, 11 Stat. 679. (Plaintiff reserves for future resolution any issue involving these areas.) Plaintiff's claim to usu-fructuary rights extends to all waters within the area affected by its claims and those lands within this same area that are publicly or privately owned if they are open to the public for the usufructuary activities at issue.

On February 8, 1831, plaintiff signed the first treaty of significance to this lawsuit. 7 Stat. 342. In addition to ceding certain land to the United States for the benefit of the New York Indians, in Article Third of the 1831 treaty, the tribe ceded a large tract of land located on the east side of the Fox River and Green Bay in the state of Wisconsin, as shown in Map 2 below.

Map 2

Territory ceded by Menominee
in Treaty of 1831

Menominee Reservation, established by
Treaty of 1854

Territory ceded by Menominee
in Treaty of 1836

The boundaries of the cession are expressly meandered along the shorelines of Lakes Winnebago and Michigan, from the mouth of the Milwaukee River to the mouth of the Fox River. The ceded area includes all of the Door Peninsula but does not include the waters of either Lakes Michigan or Winnebago.

Article Sixth of the 1831 Treaty provided that

The Menomonee [sic] Tribe of Indians shall be at liberty to hunt and fish on the lands they have now ceded to the United States, on the east side of the Fox river and Green bay, with the same privileges they at present enjoy, until it be surveyed and offered for sale by the President; they conducting themselves peaceably and orderly.

The second paragraph of the same treaty described by metes and bounds the boundaries of the tribe's lands on the west side of

the Fox River. The second paragraph of Article Sixth provided that

> the boundary, as stated and defined in this agreement, of the Menomonee country, with the exception of the cessions herein before made to the United States, the Menomonee claim as their country; that part of it adjoining the farming country, on the west side of Fox river, will remain to them as heretofore, for a hunting ground, until the President of the United States, shall deem it expedient to extinguish their title. In that case, the Menomonee tribe promise to surrender it immediately, upon being notified of the desire of [the] Government to possess it.

In treaties executed on September 3, 1836, 7 Stat. 506, and October 18, 1848, 9 Stat. 952, plaintiff ceded additional lands in Wisconsin. In Article First of the Treaty of 1836, plaintiff ceded to the United States land on the northwestern shore of Lake Winnebago and on the shore of Lake Michigan from the mouth of the Fox River to the mouth of the Escanaba River, as shown in Map 2 above. In the same article, plaintiff ceded to the United States an area along the Wisconsin River, three miles in width on either side and described as follows:

> Beginning at a point upon said Wisconsin river two miles above the grant or privilege heretofore granted by said nation and the United States, to Amable Grignon; thence running up and along said river forty-eight miles in a direct line: and being three miles in width on each side of said river; this tract to contain eight townships

or one hundred and eighty four thousand three hundred acres of land.

On May 12, 1854, plaintiff signed the Treaty of Wolf River with the United States that established the Menominee Reservation in Wisconsin. 10 Stat. 1064. *See* Map 2 above. This treaty established the Menominee Reservation as "a permanent home ... to be held as Indian lands are held," for plaintiff's exclusive use and perpetual enjoyment. At the time of the treaty, the harvest of sturgeon from the reservation waters of the Wolf River was an important and integral part of plaintiff's subsistence and figured prominently in plaintiff's cultural and religious practices. The Treaty of 1854 reserved the sturgeon resource of the reservation for the exclusive use of the tribe. Around the turn of the century, obstructions in the form of dams were constructed on the Wolf River downstream of the reservation, preventing the sturgeon from returning to the reservation waters of the river. Although sturgeon still inhabit the Wolf River, Fox River and Lake Winnebago ecosystem, they can migrate upstream only so far as the Shawano Paper Mill dam, a few miles downstream from the reservation.

## ADDITIONAL TREATY PROVISIONS

In addition to the facts alleged in plaintiff's complaint, certain facts drawn from the treaties at issue are relevant to a determination of defendants' motion. These are summarized below.

In the 1831 treaty, plaintiff set out the area of land it claimed as its own, as shown in Map 3 below. [Editor's Note: Map 3 appears on page 194]

Map 3.
Territory Claimed by the Menominees
in the Treaty of 1831

On the *east* side of Green bay, Fox river, and Winnebago lake; beginning at the south end of Winnebago lake; thence southeastwardly to the Milwauky or Man-wauky river; thence down said river to its mouth at lake Michigan; thence north, along the shore of lake Michigan, to the mouth of Green bay; thence up Green bay, Fox river, and Winnebago lake, to the place of beginning. And on the *west* side of Fox river as follows: beginning at the mouth of Fox river, thence down the east shore of Green bay, and across its mouth so as to include all the islands of the "Grand Traverse;" thence westerly, on the highlands between the lake Superior and Green bay, to the upper forks of the Meno-monee river; thence to the Plover portage of the Wisconsin river; thence up the Wis-consin river, to the Soft Maple river; thence to the source of the Soft Maple river; thence west to the Plume river, which falls into the Chippeway river; thence down said Plume river . . .

In return for the approximately three mil-lion acres plaintiff ceded to the United States in the 1831 treaty (including about 500,000 acres for the use of the New York Indians), it received, among other things, lump sum cash payments, annuities for thirteen years and the promise of the United States to employ persons to teach farming and housewifery, to erect houses for the tribe, to supply imple-ments for farming and husbandry, to support

schools, to erect and support a gun and blacksmith shop, to build a saw and grist mill, to employ a miller and to instruct interested young men in the miller's trade.

In the 1836 treaty, the tribe agreed to "cede and relinquish to the United States" more than four million acres in northeastern Wisconsin (as shown in Map 2 above) and to "remove from the country ceded, within one year after ratification of this treaty" and to relieve the United States of certain promises made in the 1831 treaty, such as the payment of farmers, blacksmiths and millers, the appropriations for education, the improvements promised for the reservation and the cattle, and the provision of farming utensils and other miscellaneous tools, utensils and other articles. In return, the tribe received annuities for twenty years and payment of its debts to certain named persons (presumably traders), as well as $3000 worth of unspecified provisions, two thousand pounds of tobacco, thirty barrels of salt and the appointment and payment of two blacksmiths.

Twelve years later, plaintiff entered into the Treaty of 1848, under which it agreed to "cede, and do hereby cede, sell, and relinquish to the United States all [its] lands in the State of Wisconsin wherever situated." 9 Stat. 952. In return, the United States agreed to "give and do hereby give, to said Indians for a home, to be held as Indians lands are held," a tract of land in west-central Minnesota, consisting of 600,000 acres. The government agreed to pay the tribe $350,000, $200,000 of which was to be paid in annuities to the tribe when the annuities promised in previous treaties had expired. The remainder was to be used for the costs of removal, resettlement and subsistence during the first year following removal; the operation of a grist mill, blacksmith shop and manual labor school; the cost of an investigatory trip to the new lands by a delegation of the tribe; and the tribe's expenses in arranging to move and to resettle on the new lands. The treaty provided that the tribe would be permitted to stay in Wisconsin on the ceded lands for two more years "until the President shall notify them that the same are wanted."

The tribe's delegation traveled to Minnesota and found the new lands unsuitable. Its "manifestation of great unwillingness ... to remove to the country west of the Mississippi river, upon Crow Wing, which had been assigned them, and a desire to remain in the State of Wisconsin," Treaty of 1854, Preamble, 10 Stat. 1064, led to negotiations with the United States for the Treaty of Wolf River of May 12, 1854, that was explicitly "supplementary and amendatory to the [1848 treaty]." *Id.* The tribe agreed to "cede, sell and relinquish to the United States" all the Minnesota lands assigned to it under the 1848 treaty in exchange for the Wisconsin lands along the Wolf and Oconto rivers in east-central Wisconsin that became its reservation, "to be held as Indians lands are held." *Id.* In addition to the grant of the reservation lands, the 1854 treaty retained the removal and subsistence payment guarantees provided in the 1848 treaty.

### FACTS SUBJECT TO JUDICIAL NOTICE

■ I take judicial notice of the following public records and documents filed in public offices. *Oneida Indian Nation of New York v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (even on motion to dismiss, judicial notice may be taken of incontrovertible facts from materials whose authenticity is not in question).

According to the Annual Report of the Commissioner of Indian Affairs for 1851, in 1850, R.W. Thompson, a lawyer representing plaintiff, wrote to the United States Secretary of the Interior, advising him of plaintiff's position that it had conveyed more land under the treaty of 1848 than the federal government had acknowledged. Thompson asked that a new treaty be made because the old one was the product of fraud and violence employed by the federal government against the Menominee and a new treaty was the "only legal mode of redressing the wrongs and grievances of which they complain." Annual Report of the Commissioner of Indian Affairs for 1851, Appendix to Brief of Wisconsin Paper Council at 62.

In proceedings before the Indian Claims Commission in 1951, plaintiff asserted that in

the treaty it signed in 1848, it had "relinquished and ceded . . . all its right, title and interest in and to all its remaining lands in Wisconsin." Menominee Petition to Indian Claims Commission, June 26, 1951, ¶ 7(i), Defs.' App. at 260. On July 10, 1951, plaintiff recovered $8,500,000 in separate proceedings before the United States Court of Claims through a settlement. Defs.' App. at 239–40. Paragraph 3 of the stipulation with the United States provided:

> 3. In consideration of . . . $8,500,000 . . . the plaintiff Tribe hereby releases all other claims, whether legal, equitable or moral and whether or not specifically mentioned or referred to herein, which the said Tribe may have against the United States up to the present time, including land claims arising under the Treaties of [1831, 1836, 1848, and 1854].

Defs.' App. at 242. The July 13, 1951 order of dismissal by the Court of Claims provided that the parties had "compromised and settled their differences" in settlement of both those Court of Claims cases "and other liabilities." Defs.' App. at 243. On December 10, 1951, a joint stipulation and motion to dismiss the Indian Claims Commission matter was submitted by the parties with the statement that "this was a result of a compromise of Menominee litigation." Defs.' App. at 264–65. The Indian Claims Commission matter was dismissed "with prejudice" on April 24, 1952. Defs.' App. at 276.

A memorandum report filed with the Court of Claims recited that the settlement related to claims asserted in seven different proceedings before the court, covering such matters as lost interest on trust funds and improper taking of timber. Defs.' App. at 247–50. The memorandum makes no reference to land claims.

## OPINION

### A. *Plaintiff's Claims*

In the first count of its complaint, plaintiff contends that it retains treaty-reserved usufructuary rights in the territory it ceded under Article Sixth of the Treaty of 1831 on the east side of the Fox River and Green Bay, including "all waters within the area."

In count II, plaintiff contends that under the second paragraph of Article Sixth, it retains treaty-reserved usufructuary rights in that part of Menominee country "adjoining the farming country, on the west side of the Fox river" and all waters within the area. In count III, plaintiff contends that it has aboriginal usufructuary rights in the waters of Lake Michigan and Winnebago and in and along a portion of the Wisconsin River and that these rights derive from its occupancy of the adjacent land and the use of the lakes. Plaintiff contends also that when it ceded the land on the eastern shore of Lake Winnebago and along part of the shore of Lake Michigan in the Treaty of 1831 and the land on the northwestern shore of Lake Winnebago and the remainder of the shoreline of Lake Michigan in the Treaty of 1836, the boundaries of its cession were meandered expressly along the shoreline and did not include any of the waters of either lake. Accordingly, plaintiff contends, it did not relinquish any of its aboriginal rights in the two lakes.

In count IV, plaintiff contends that the federal government recognized plaintiff's usufructuary rights in the Wisconsin waters of Green Bay in paragraph second of Article Sixth of the Treaty of 1831 and that neither the Treaty of 1831 nor the Treaty of 1836 extinguished these treaty-reserved rights. In count V, plaintiff contends that it retains aboriginal usufructuary rights to a specific portion of the Wisconsin River recognized by the government in Article First of the Treaty of 1836 and that the treaty does not contain any release or relinquishment of the tribe's usufructuary rights in the ceded area. In count VI, plaintiff contends that it has a treaty-based right to fish downstream of the obstructions on the Wolf River in order to enjoy its 1854 reservation rights that have been violated by the obstruction of the upstream migration of sturgeon.

### B. *Posture of Case*

■ In the majority of cases involving interpretation of treaties, courts have decided the treaties' meaning either after trial or on a well developed record prepared in connection with a motion for summary judgment. *See, e.g., Mille Lacs Band of Chippewa Indians v. Minnesota*, 861 F.Supp. 784, 840

(D.Minn.1994) (canons of construction for Indian treaties require "careful examination of the historical record to determine the intent of the parties"), *appeal dismissed in part and briefing ordered in part*, 48 F.3d 373 (8th Cir.1995); *United States v. Bouchard*, 464 F.Supp. 1316, 1357 (W.D.Wis.1978) (Indians' understanding of treaty determined on cross-motions for summary judgment), *rev'd on other grounds sub nom. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341 (7th Cir.1983). Defendants contend, however, that there is no prohibition against deciding a treaty case on a motion to dismiss when the only issues are ones of law or when the plaintiffs have failed to allege facts sufficient to state a claim and they cite *United States v. Santa Fe Pacific Railroad*, 314 U.S. 339, 344, 62 S.Ct. 248, 250, 86 L.Ed. 260 (1941) (grant of motion to dismiss affirmed for government's failure to state a claim on which equitable relief could be granted) and *Sokaogon Chippewa Community v. Wisconsin*, 879 F.2d 300, 301–03 (7th Cir.1989) (affirming grant of motion to dismiss on ground that statute of limitations had run on tribe's suit against United States). *See also Choctaw Nation v. United States*, 318 U.S. 423, 430–33, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943) (reversing Court of Claims, which had taken evidence of parties' understanding of treaty, and holding that findings were inadequate to justify departure from unambiguous language of agreement); *United States v. Choctaw & Chickasaw Nations*, 179 U.S. 494, 532–542, 552, 21 S.Ct. 149, 164–68, 171, 45 L.Ed. 291 (1900) (same).

I agree with defendants that this case can be treated like any other, giving due regard to the canons of construction that govern Indian treaty interpretation. If defendants can show that plaintiff has failed to allege facts sufficient to state a claim on which relief can be granted or that plaintiff is barred as a matter of law from prosecuting the case, they are entitled to prevail on their motion to dismiss.

### C. *Treaty–Reserved Usufructuary Rights—Counts I and II*

Plaintiff rests its interpretation of the treaties on two arguments. The first is that the construction of the treaties cannot be determined on a motion to dismiss because the court cannot know without taking evidence how the Menominee understood the language and import of those treaties at the time they were signed. Thus, although the 1831 treaty appears to contain specific temporal limits on the tribe's right to hunt and fish on its lands (on the lands it was ceding on the east side of the Fox River and Green Bay *until those lands were surveyed and offered for sale by the President* and on the lands it was retaining on the west side of the Fox *until the President of the United States should deem it expedient to extinguish the tribe's title*), the court cannot assume that the Menominee understood their hunting and fishing rights to be limited in duration. To the contrary, plaintiff asserts in its brief, its leaders understood that the treaty allowed the tribe to hunt, fish and gather on the lands and waters in both the ceded and unceded territory so long as these activities did not conflict with the settlers on the land. Plaintiff does not explain the historical basis for the tribe's understanding or attempt to tie its interpretation to any particular treaty provision or extrinsic event. However, plaintiff maintains it should have an opportunity to adduce evidence on such matters as the tribe's cultural circumstances, its leaders' ability to understand what they were agreeing to, their intent in signing the treaties and their subsequent actions to the extent they are reflective of the tribe's understanding of the treaties.

Plaintiff's second argument is that once the federal government reserved usufructuary rights in the ceded lands to the tribe, as it did in the 1831 treaty, it could not extinguish those rights except by explicit provision in a treaty or by other congressional action that evidenced an intent to abrogate these rights. In a variant of this argument, to be taken up in Part D, *infra*, plaintiff asserts that the government could abrogate aboriginal usufructuary rights only in the same manner that it extinguished treaty-reserved usufructuary rights, that is, by explicit provision in a treaty or by congressional action. According to plaintiff, none of the treaties the tribe executed after 1831 contained any explicit reference to the extinguishment of its usu-

fructuary rights, either treaty-retained or aboriginal; plaintiff ceded title and occupancy rights in the treaties but did not give up its separate and distinct usufructuary rights. Therefore, it argues, the tribe's members may continue to exercise those rights, free of any restrictions imposed by the state of Wisconsin.

In response to plaintiff's arguments, defendants maintain that plaintiff's treaty-reserved rights were unambiguously temporary and the conditions for extinguishment have been met; the 1836 treaty extinguished the 1831 temporary rights west of the Fox River because it ceded title to those lands and required removal from them; statehood extinguished any and all temporary rights throughout Wisconsin; the 1848 removal treaty extinguished any and all other interests plaintiff had in all Wisconsin lands wherever situated; the United States Supreme Court has ruled that the tribe has lost all its off-reservation usufructuary rights; and plaintiff is judicially estopped from denying extinguishment of its treaty rights because it has taken a prior inconsistent position in formal legal proceedings and is now bound by that position.

### 1. *Factual sufficiency of plaintiff's allegations*

It is a close question whether plaintiff's allegations in support of counts I and II are sufficient to state a claim. Plaintiff's assertion of the tribe's understanding of the duration of its usufructuary rights is not fleshed out with supporting detail. It has not explained why its members thought the usufructuary rights would continue indefinitely in the face of language that provided that the activities would last only until the lands were offered for sale or until title was extinguished. Plaintiff does not suggest that the tribe understood the phrase, "they conducting themselves peaceably and orderly" to mean that its usufructuary rights (on the east side of the Fox River at least) might continue indefinitely. The tribe does not describe any statements made to its leaders during negotiations that might have led them to such an understanding or cite any specific language in the treaty that might have con-

veyed such an understanding to the tribe. Plaintiff refers to "hundreds, perhaps thousands, of documents which surround the treaty transactions," and adds that "[i]t is from these documents as explained by persons steeped in the history of the age and the culture and world view of the Tribe that the Indians' understanding may be gathered." Pl.'s Brief, dkt #25, at 25. Presumably, plaintiff is familiar with these documents and the opinions of the experts and has grounds for its claims. It would have been helpful had plaintiff revealed these grounds to the court and to defendants.

In its brief in opposition to defendants' motion to dismiss, plaintiff has added some factual allegations to flesh out the spare allegations of its complaint. Plaintiff says that it is necessary to assume that at the time the treaties were signed, the Menominee met their subsistence needs through a mixed agrarian, hunting and gathering economy that focused on the rivers, lakes and upland marshes in the area; that the tribe took a variety of fish species from the rivers and lakes, hunted and trapped inland and collected food plants, including wild rice; that its primary territory was the area along the shore of Green Bay and around Lake Winnebago; that identifiable bands of the Menominee lived on the Wolf, Menominee, Peshtigo, Fox and other smaller rivers, and on Lake Winnebago and Green Bay; and that in entering into treaties with the United States, the Menominee sought to protect a constellation of resources upon which the tribe relied for its subsistence, cultural integrity, political autonomy and land tenure.

Defendants do not dispute the importance of the land to plaintiff or plaintiff's desire to obtain the most beneficial result for its members in each of the treaty negotiations. However, the question is not what plaintiff wanted or needed when it entered into negotiations with the United States; it is what plaintiff actually agreed to in its treaty negotiations. On that question, plaintiff is noticeably reticent. Nevertheless, I believe it would be improper to dismiss all of plaintiff's claims at this stage of the litigation.

It is well known that Indian treaties must be interpreted as the Indians un-

derstood them, that doubtful expressions are to be resolved in favor of the Indians and that treaties must be construed liberally in favor of the signatory tribes. These venerable canons of construction reflect the unequal bargaining positions of the parties that entered into the treaties. The United States was represented by persons "skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves." *Jones v. Meehan,* 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1889). The "Indians, on the other hand, [were] a weak and dependent people, who [had] no written language and [were] wholly unfamiliar with the forms of legal expression...." *Id.* Accordingly, treaties are not to be construed by "the technical meaning of [their] words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Id.*

Determining the Indians' understanding may require expert testimony to explain the historical and cultural context in which the Indians viewed the treaty provisions. *See, e.g., McClanahan v. State Tax Comm'n of Arizona,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973) (treaties are not to be read as ordinary contracts agreed upon by parties with equal bargaining positions); *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930) ("Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith."); *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908) ("ambiguities occurring [in treaties] will be resolved from the standpoint of the Indians").

■ It is true that "[t]he canon of construction regarding the resolution of ambiguities ... does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe,* 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986). *See also Amoco Production Co. v. Gambell,* 480 U.S. 531, 555, 107 S.Ct. 1396, 1409, 94 L.Ed.2d 542 (1987)

(citing *Catawba Indian Tribe*); *Choctaw Nation,* 318 U.S. at 432, 63 S.Ct. at 678 ("even Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties"). As I have noted, plaintiff has not identified any provision of the treaties it believes to be ambiguous. It may well be that it will be unable to do so even after the record has been developed. However, the treaties are not models of clarity or good draftsmanship. I cannot say with certainty that plaintiff will not be able to demonstrate that the treaties could have been understood reasonably by plaintiff's leaders to mean something other than what they seem to say.

■ The three major cases involving treaty rights of Indians of the upper Midwest teach the important lesson that ambiguities in treaties are often subtle and not obvious to modern readers. *See, e.g., Mille Lacs Band of Chippewa Indians,* 861 F.Supp. 784; *Lac Courte Oreilles,* 700 F.2d 341, *United States v. Michigan,* 471 F.Supp. 192 (W.D.Mich. 1979); *aff'd in relevant part,* 653 F.2d 277 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). In both the *Mille Lacs* and *Lac Courte Oreilles* litigation, the courts determined that the Chippewa retained usufructuary rights under a provision in an 1837 treaty that provided that the Chippewa signatory bands could continue to enjoy usufructuary rights on the land they ceded to the United States "during the pleasure of the President of the United States," a term the courts found to be ambiguous. It could mean an "at will" kind of occupancy in which the President was free to order the Chippewa out of the territory at any time for any reason or it could mean he was free to do so only if the Chippewa misbehaved and incurred his displeasure. The Lac Courte Oreilles produced contemporary reports that supported their contention that when the tribes had signed treaties in 1837 and 1842, they understood that "the pleasure of the President" meant their right to hunt, fish and gather would continue undisturbed unless they misbehaved. *Lac Courte Oreilles,* 700 F.2d at 356; *Bouchard,* 464 F.Supp. at 1348–49.

The Lac Courte Oreilles and other Chippewa bands entered into another treaty in 1842 under which they could continue to exercise their usufructuary rights "until required to remove by the President of the United States." In 1850, President Zachary Taylor issued an executive order requiring the tribes' removal. All of the courts that have considered the matter have concluded that the President issued the order without any evidence that the Chippewa had misbehaved. The order was illegal: neither authorized by the treaties nor within the scope of the President's power. *Mille Lacs*, 861 F.Supp. at 826; *Lac Courte Oreilles*, 700 F.2d at 362; *Bouchard*, 464 F.Supp. at 1350. The Court of Appeals for the Seventh Circuit concluded that without a lawful order of removal, and without any showing that the treaty negotiated in 1854 extinguished the tribes' usufructuary rights, the state of Wisconsin had failed to show that the Wisconsin Chippewa had lost their right to hunt, fish and gather in the ceded territory. *Lac Courte* Oreilles, 700 F.2d at 364–65. The district court in Minnesota reached the same conclusion with respect to the Mille Lacs band after finding that an 1855 treaty signed did not explicitly extinguish the tribe's usufructuary rights.

In *United States v. Michigan,* 471 F.Supp. 192, the district court found that certain Michigan Ottawa and Chippewa tribes' right to fish in the Great Lakes had not been extinguished by white settlement, despite language in a treaty signed in 1836 setting a temporal limit on the Indians' right of hunting on the ceded lands and other privileges of occupancy "until the land is required for settlement." The district court held that this language would not have been understood by the Indians as restricting their right to fish in the Great Lakes "because these large bodies of water could not possibly be settled by homes, barns and tilled fields." *Id.* at 253. In the court's view, the Indians might have understood that they were giving up their right to hunt as the land became settled but they would not have understood that their right to fish would be lost; the "western movement of non-Indian settlers could be accommodated without requiring the Indians to relinquish their aboriginal and treaty rights to fish." *Id.*

Although it does not follow ineluctably from the fact that the treaties with the Chippewa were ambiguous that the treaties the Menominee signed were ambiguous, the sophistication of the analyses in the cited cases sounds a cautionary note against deciding the meaning of the Menominee treaties without a more complete record. Of course, it is not enough for plaintiff simply to assert that because the Michigan Chippewa would have thought the Great Lakes unnecessary for "settlement," the Menominee would have had the same understanding about the far smaller lakes and rivers in their territory. Plaintiff will have to adduce facts to show why the Menominee would have had such an understanding under the very different circumstances of their tribal culture, their location and the terms of the treaties they executed. However, I cannot say at this stage of the litigation that plaintiff cannot make this showing.

Defendants are concerned, and rightly so, about the expense of lengthy and wide-ranging discovery they may have to conduct if this case is not dismissed at this time. I suspect that the discovery can be narrowed by a prompt determination of the facts upon which plaintiff will rely to support its assertion that its leaders would have reasonably understood the 1831 treaty to mean they had an indefinite usufructuary privilege on the ceded and unceded land described in the treaty. Submission of contention interrogatories to plaintiff should be sufficient to learn the factual basis for its claims. Certainly, plaintiff would not have brought this suit had it lacked a reasonable factual basis for its claims, knowing of the requirements Fed. R.Civ.P. 11 imposes upon parties litigating in federal court. More to the point, a premature dismissal of plaintiff's action would only increase the parties' ultimate expenditure of time and money. It is a better use of the parties' and court's resources to defer decision until a proper record has been developed.

Plaintiff points to the Menominee's continued fishing and hunting in Wisconsin as an indication of its members' belief that the tribe retained permanent usufructuary rights

under the various treaties. Plaintiff alleges, and defendants do not dispute, that the tribe continued to travel and use resources in Wisconsin following the signing of the 1848 treaty and after the establishment of the Menominee reservation in 1854. Although in and of itself such activity is not sufficient to show the understanding of the tribe in signing the various treaties, it could lend support to other evidence showing that the tribe believed it had retained its usufructuary rights. *See Lac Courte Oreilles,* 700 F.2d at 364 (that Chippewa tribes continued to hunt and fish on ceded territory long after their reservations were created is evidence of Indians' understanding of treaty). *Cf. Sokaogon Chippewa Community v. Exxon Corporation,* 805 F.Supp. 680, 689–90, 698–700, 703 (E.D.Wis.1992) ("whatever rights the [Sokaogon Chippewa] kept after the ratification of the 1854 treaty, they maintained approximately the same nomadic lifestyle they had previously," but such activity did not give them any right of occupancy in the land), *aff'd* 2 F.3d 219, 222 (7th Cir.1993) (Sokaogon could not rely on their use of off-reservation lands to establish right to occupy those lands when government had never acknowledged tribe's right to remain where members were living). *See also Bouchard,* 464 F.Supp. at 1359 (hunting and fishing on public and undeveloped land was part of frontier way of life for Indians and white people alike; thus, Indians' practice of roaming on non-reservation lands is not persuasive evidence they were exercising special treaty rights); *Healing v. Jones,* 210 F.Supp. 125, 147–48, 174 (D.Ariz.1962) (failure to use force to eject Indians from area does not constitute implied agreement to allow Indian settlement; "Actual use and occupancy of land, without more, has no connotation of rightful possession. A trespasser may have actual use and occupancy of land."), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). However, it is too early in the litigation to assess the nature and weight of the evidence of continued use that plaintiff will introduce to support its claims. This is another reason why dismissal of the case would be premature without a fully developed record.

### 2. *Legal status of use rights*

Plaintiff's second argument is based entirely on legal grounds. It relates to the separability of use and occupancy rights and the endurance of use rights. Much of what plaintiff says is indisputable: if a tribe has a treaty-reserved usufructuary right of indefinite duration, that right can continue to exist even if the tribe cedes its right of occupancy in the same land on which the use right runs. *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905); *Lac Courte Oreilles,* 700 F.2d 341. Such a right can be terminated or abrogated only by explicit language in a later treaty or by congressional action evidencing governmental intent to end the right. *Id.* at 356 (citing *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) (articulating for first time requirement that treaty-protected use rights require explicit language for extinguishment).

If plaintiff can establish that its leaders would have understood reasonably from the provisions of the 1831 treaty that the Menominee's usufructuary rights would last indefinitely so long as their activities did not conflict with the settlers, then it would follow that the tribe retains those rights unless defendants can show either that the rights were terminated expressly by a later treaty or that Congress intended and achieved their abrogation. On the other hand, unless plaintiff can prove that the plain language of the treaty does not control the duration of the rights, the question of explicit extinguishment of the usufructuary rights does not arise. It would be unnecessary for the government to provide expressly for the extinguishment of rights that were to expire of their own accord. The rights would be extinguished by the occurrence of the terminating events, as provided.

Plaintiff does not agree with the proposition that recognized use rights may terminate of their own accord under specific provisions of the treaty in which they were recognized. It contends that once the government recognizes a usufructuary right, that right is "severed" from the rights of title and occupancy and can be terminated only by explicit extinguishment in a subse-

quent treaty or by other congressional action, even if the right recognized by the government is expressly intended to be of a limited duration. As I understand plaintiff's argument, it is that it is not sufficient to provide that a tribe will retain rights until the occurrence of a particular event such as surveying and offering for sale; rather, the government must provide explicitly that the rights will continue until the occurrence of the particular event *at which time the hunting and fishing rights will be extinguished.* Moreover, plaintiff argues, defendants seem to be unaware that rights of use and occupancy are separable and that the whole idea of usufructuary rights is that they do not depend upon occupancy rights or title to the underlying land. *See* Pl.'s Brief, dkt. # 25, at 3 ("[A] critical defect in the State defendants' argument relates to their failure to understand and accept that use rights are separate and distinct from occupancy rights and title to land.")

■ Plaintiff has cited no support for its contention that any recognition of a use right severs it from rights of title and occupancy and requires explicit language for extinguishment. It is inconsistent with the law, which recognizes that extinguishment of use rights can occur in accordance with treaty provisions. *See* Felix S. Cohen, *Handbook of Federal Indian Law* 468 (1982) ("Indian hunting and fishing rights can be terminated in the same way as other treaty rights. They can be extinguished by the terms of the treaty itself, by Act of Congress, or by a subsequent inconsistent treaty.") (citing *Ward v. Race Horse,* 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896) (treaty right to hunt on unoccupied lands of United States so long as peace exists between whites and Indians expired when United States conveyed lands to state of Wyoming)).

### 3. *Effect of 1848 treaty*

Defendants contend that even if plaintiff could show that its usufructuary rights did not expire by their own terms, the tribe would have to show that the 1848 treaty did not extinguish those rights, which is something plaintiff cannot do. Defendants char-

acterize the 1848 treaty as an "obligatory removal" treaty unlike the permissive removal treaties entered into by the Chippewa tribes and one that took effect immediately upon signing, thereby making it an "in praesenti" treaty, that is, one taking effect immediately. Defendants maintain that the sweeping language of the 1848 treaty would have been understood by the Menominee as a relinquishment of all rights, including those of hunting and fishing. Moreover, even if the tribe did not understand from the words of the treaty that it was relinquishing its usufructuary rights, it would have understood that this would follow from the treaty's requirement that the tribe leave the area it had occupied for centuries and move hundreds of miles west to an area beyond the Mississippi. In response, plaintiff asserts that the 1848 treaty was null and void because it was the product of fraud and coercion, that it never took effect because the tribe never moved to the new reservation lands and that it was nullified by the 1854 treaty that allowed the tribe to remain in Wisconsin. In addition, plaintiff maintains that the significance of the treaty cannot be determined without exploring the tribe's understanding of it.

■ Enough questions persist about how the tribe perceived its obligations and cessions under the 1848 treaty to make it improper to hold as a matter of law that plaintiff could never show that the tribe understood the treaty as something far different from what it appears to be, that is, an in praesenti treaty of obligatory removal that by its nature would have had the effect of extinguishing all rights possessed by the tribe, including those of hunting and fishing. For example, the provisions giving the tribe an opportunity to make an exploratory trip to the new reservation and the right to remain in Wisconsin for two more years or "until the President shall notify [the tribe] that the [lands in Wisconsin] are wanted" raise questions about the alleged obligatory nature of the treaty. I cannot say whether the Menominee would have understood it as terminating their occupancy rights on the land, let alone their usufructuary rights. However, I agree with defendants that

plaintiff cannot prevail on its assertions that the 1848 treaty can be ignored because it is the product of fraud and coercion or because it was nullified by the 1854 treaty. The first of these assertions is wrong as a matter of law; the inaccuracy of the second can be determined by reading the language of the 1854 treaty, the plain meaning of which has not been challenged by plaintiff.

It is well settled law that courts may not look behind a treaty to evaluate its legitimacy. Even if a treaty is the product of bribery, fraud or duress or executed by representatives of minority factions of the signatory tribes, it is considered the law of the land, subject to the same respect as any law passed by Congress and any treaty signed with a foreign nation. *See* Cohen, *supra,* at 63 (citing *United States v. New York Indians,* 173 U.S. 464, 469–70, 19 S.Ct. 487, 489–90, 43 L.Ed. 769 (1899); *Fellows v. Blacksmith,* 60 U.S. (19 How.) 366, 372, 15 L.Ed. 684 (1857)). *See also Lone Wolf v. Hitchcock,* 187 U.S. 553, 567–68, 23 S.Ct. 216, 222, 47 L.Ed. 299 (1903) (Court could not consider contentions that 1892 treaty with Kiowa and Comanche was obtained by fraudulent misrepresentations and concealment, that requisite number of male Indians had not signed and that treaty had been amended by Congress without submitting such amendments to the Indians because these matters were "solely within the domain of the legislative authority and its action is conclusive upon the courts"); *Choctaw & Chickasaw Nations,* 179 U.S. at 535–36, 21 S.Ct. at 165 (if treaty of 1866 did injustice to Choctaws and Chickasaws, remedy is not with courts, but with political department of government). Whatever improper or even illegal acts induced the Menominee to sign the 1848 treaty, the treaty cannot be ignored when determining the Menominee's understanding of the rights they did or did not retain.

Plaintiff's suggestion that the 1854 treaty "nullified" the 1848 treaty is not borne out by anything in the language of the later treaty, in which plaintiff ceded all of the Minnesota territory granted it in 1848 in return for the twelve townships of land on the Wolf and Oconto Rivers that were to constitute its reservation. The 1854 treaty says explicitly that it is intended to be amendatory and supplementary to the 1848 treaty. Moreover, it retains many of the guarantees given in 1848, carries over payments that were to have been made under the earlier treaty and makes no reference to rescinding the earlier cession of land. In fact, the treaty provides additional compensation to plaintiff for the lands ceded in the 1848 treaty (presumably in response to R.W. Thompson's 1850 entreaty to the Commissioner of Indian Affairs on behalf of the Menominee).

Both the Supreme Court of Wisconsin and the United States Supreme Court have read the 1854 treaty as making an entirely new grant of rights to plaintiff, rather than as rescinding the 1848 treaty and restoring plaintiff to its prior position and previous rights. *See State v. Sanapaw,* 21 Wis.2d 377, 382, 124 N.W.2d, 41, 43 (1963) ("1848 treaty ceded all lands in Wisconsin to the United States, and the 1854 treaty did not abrogate this cession, but made an entirely new cession"); *Menominee Tribe,* 391 U.S. at 405, 88 S.Ct. at 1707 ("By [1854] treaty the Menominees retroceded certain lands they had acquired under an earlier treaty and the United States confirmed to them the Wolf River Reservation."). Plaintiff may be able to prove that the 1848 treaty did not have the effect defendants say it had, but the tribe cannot show that it was nullified by the 1854 treaty.

4. *Acceptance of payments, annuities and supplies*

In return for signing the 1848 treaty ceding all remaining land in Wisconsin to the federal government and agreeing to remove to western Minnesota, the Menominee were to receive 600,000 acres of land in western Minnesota and various cash payments of more than $350,000. Defendants suggest that such payments are evidence that the tribe knew it was giving up all its usufructuary rights. Why else, they ask, would the government have made such payments if not to reimburse plaintiff for the loss of its usufructuary rights and to provide alternative means of subsistence? *Cf. Sokaogon Chippewa Community,* 2 F.3d at 225 (acceptance of annual payments provided under treaty of

1842 implies that Sokaogon Chippewa accepted burdens of treaty as well as its benefits and that they surrendered their right of occupancy). The answer to this question is not as obvious as defendants suggest. The offer and acceptance of such payments are ambiguous, at least on the present record. Given that the government expected (and certainly implied to the tribe) that the new Minnesota lands would provide hunting and fishing opportunities, it is not evident that the payments were intended to make up for the loss of usufructuary rights in Wisconsin. It is just as likely that the payments were made to cover the costs of moving to a new location and establishing a new community. It is even more likely that the payments were intended to encourage the tribes to develop agricultural interests to replace their nomadic hunting and fishing existence. Defendants' argument is not a sufficient reason to dismiss plaintiff's first and second claims.

5. *Effect of statehood*

██ Defendants contend that Wisconsin's admission to statehood in 1848 had the effect of extinguishing all of the Menominee's temporary, title-dependent rights, including the usufructuary rights at issue. Citing *Ward v. Race Horse,* 163 U.S. 504, 16 S.Ct. 1076, defendants argue that permanent treaty-reserved rights outlast admission to the Union, but temporary rights do not; if it were otherwise, no state would enter into the Union on an "equal footing" with the other states. In *Race Horse,* the question was whether the state of Wyoming could prosecute a member of the Bannock tribe for killing elk off the reservation in violation of the state's game laws. The Court concluded that the state could prosecute, despite the language of the treaty entered into with the Bannocks under which a reservation was set aside for the tribe and the members were guaranteed "the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon." *Id.* at 505, 16 S.Ct. at 1076. To reach a different conclusion, said the court, would mean that Wyoming would be unable to regulate the killing of game within its borders and to that extent, would have been admitted to the Union, "not as an equal member, but as one shorn of a legislative power vested in all the other States of the Union, a power resulting from the fact of statehood and incident to its plenary existence." *Id.* at 514, 16 S.Ct. at 1080.

As plaintiff points out, the *Race Horse* decision has been criticized frequently and has been limited in its scope by subsequent decisions. *See, e.g., United States v. Winans,* 198 U.S. at 382–84, 25 S.Ct. at 664–65 (sustaining off-reservation treaty fishing rights against "equal footing" arguments). *See also* Cohen, *supra,* at 469–70. *But see Crow Tribe of Indians v. Repsis,* 73 F.3d 982 (10th Cir.1995) (although 1868 treaty reserved right to tribes "to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts," court found that tribe's hunting rights did not survive Montana's admission to statehood, relying on decision in *Race Horse* that addressed identical treaty language).

Defendants acknowledge the criticism of *Race Horse,* but maintain that the holding continues to apply to rights that are only temporary. This argument begs the question. It is the nature and scope of the rights that are in dispute. If, in fact, the rights granted plaintiff in the 1831 treaty are temporary in nature, as defendants contend, then the rights expired on their own terms and the equal footing doctrine has no relevance. If, as plaintiff contends, the rights are permanent, then the equal footing doctrine does not affect them. *See generally* Cohen, *supra,* at 268 n. 73: "Indian rights depend on determination of the scope of federal treaties and laws, and the Equal Footing Doctrine is irrelevant to that determination." Whether the rights reserved by plaintiffs were temporary or permanent and whether the *Race Horse* opinion has any relevance are issues whose resolution must await further development of the factual record.

6. *Interrelationship of all treaties*

██ Defendants argue that the interrelationship of the treaties reveals a pattern that undermines plaintiff's claims to a continuing usufructuary right. It is true that the trea-

ties reveal the United States' pursuit of the goal of securing all of the tribe's land in Wisconsin for the use of white settlers. Thus, in the 1831 treaty, the government laid out the boundaries of the tribe's land claim and secured a cession of hundreds of thousands of acres of land in northeastern Wisconsin, while reserving to plaintiff a temporary right to continue to hunt and fish in the ceded territory. In the 1836 treaty, the government secured a second cession of land on the west side of the Fox River, reserving nothing for the tribe, and in 1848, the government secured a cession of the remaining land in Wisconsin that plaintiff occupied, reserving nothing for the tribe and requiring its complete removal to west-central Minnesota. Each treaty built upon its predecessor by continuing forward the obligations undertaken in the previous agreements. The signing of a new treaty did not discharge the parties from their obligations unless specific provision was made for doing so.

Having established that a pattern existed, however, defendants have not shown that plaintiff cannot prove that it retained usufructuary rights in its land in Wisconsin. This depends on the proof that plaintiff can adduce of its members' understanding of the treaties, primarily those signed in 1831 and 1848.

### D. Usufructuary Rights in Waters of Wisconsin

#### 1. Count III—aboriginal rights to hunt and fish in Wisconsin waters

■ *Aboriginal title* derives from a native people's occupancy of a specified area continuously from a time preceding the arrival of white settlers. *Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955). *Aboriginal usufructuary claims* to hunt, fish and gather "are founded on immemorial custom and practice." Cohen, *supra,* at 442. As the law developed in the United States, native tribes were held to have the right of occupancy of land but title resided in the occupying Europeans. Felix S. Cohen, *Original Indian Title,* 32 Minn.L.Rev. 28, 48 (1947) (citing *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823)). This means that as occupying sovereign, the United States may

grant third parties title to Indian land but only after terminating the possessory title of the Indians. *Id.* The federal government grants and protects aboriginal rights "against intrusion by third parties," *Tee–Hit–Ton Indians,* 348 U.S. at 279, 75 S.Ct. at 317, and it alone has the power to extinguish aboriginal title by treaty, agreement, or other authorized action of Congress or the Indians. Cohen, 32 Minn.L.Rev. at 53. "[E]xtinguishment [of aboriginal title] cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *United States v. Santa Fe Pacific Railroad,* 314 U.S. at 354, 62 S.Ct. at 255. In *Santa Fe,* the Court held that the Walapai were not divested of their title when a series of congressional and executive actions treated their lands as publicly owned by mistake but that President Arthur's subsequent order creating a reservation at the request of the Walapai Indians and its acceptance by them "amounted to a relinquishment of any tribal claims to lands based on aboriginal occupancy." *Id.* at 357–58, 62 S.Ct. at 257.

■ In support of its claim in count III of the complaint that it has unextinguished aboriginal rights to hunt and fish within the waters of Lake Michigan, Green Bay, Lake Winnebago and part of the Wisconsin River, plaintiff makes the following arguments. Before any white settlers came to Wisconsin and long before any treaties were signed, the tribe occupied the shorelines and used the resources of these waters. This occupancy and use gave the tribe both aboriginal title and separate aboriginal use rights. Although many courts have held that the sovereign can abrogate aboriginal rights at any time and by any means, the situation is different in those parts of the country to which the Northwest Ordinance of 1789 applies. When this ordinance was adopted, it incorporated the promise of the United States government to observe the utmost good faith in its dealings with the Indians and never to take their lands or property from them without their consent. These provisions gave special protection to aboriginal rights, making them subject to extinguishment only by explicit provision. None of the treaties with

the Menominee includes any provision extinguishing the tribe's aboriginal use rights explicitly and, with respect to Lakes Winnebago and Michigan, plaintiff never ceded the waters included within the meandered boundaries that were excepted from the cessions plaintiff made in the 1831 and 1836 treaties. (In those treaties, the parties described the area of cession with boundaries that were meandered expressly along the shores of the lakes, so that none of the waters of the lakes themselves were included.)

It is not necessary to decide the merits of plaintiff's argument that special rules apply to the abrogation of aboriginal rights in states covered by the Northwest Ordinance. (In any event, it is difficult to see its relevance; all of the land at issue was secured by the United States by purchase and not by force.) Plaintiff's basic claim to aboriginal use rights rests on the same factual grounds as its claims to treaty-reserved rights identified in the preceding discussion of counts I and II. Plaintiff must show that it would not have been reasonable for its members to have understood the language of the 1831 treaty as setting a temporal limit on the exercise of the tribe's usufructuary rights and to have understood the purpose and effect of the 1848 treaty as relinquishing their usufructuary rights in Wisconsin.

■ Plaintiff has another argument relating to usufructuary rights in Lakes Michigan and Winnebago. It maintains that its cession of the land surrounding these lakes in the 1831 and 1836 treaties did not amount to an express relinquishment of its rights to hunt and fish in those lakes because it never ceded the lakes themselves. According to plaintiff, the cessions in both treaties excluded the area within the meandering boundaries of the lakes. Thus, even if the 1831 and 1836 treaties are interpreted according to their plain meaning, they would not operate to extinguish plaintiff's aboriginal usufructuary rights in the lakes.

This argument is logically inconsistent. The 1831 treaty had more than cession as its object: another purpose was to define the metes and bounds of the lands plaintiff claimed as its own in the state of Wisconsin so as to establish the tribe's land boundaries in an effort to prevent encroachment by other tribes. The description of the land claimed by plaintiff used the same "meandering boundaries" of Lakes Michigan and Winnebago·that the parties used in the 1831 and 1836 treaties to describe the boundaries of the cessions. Plaintiff does not explain the apparent inconsistency in arguing that it retains a claim to certain property because it did not include the property within the boundaries of a cession when the same reading of the boundaries would mean that plaintiff never identified the property in the 1831 treaty as being its own.

Assuming that the argument could survive its inherent illogic, it would rise or fall on the plaintiff's understanding of the 1831 and 1848 treaties. In addition, plaintiff would have to show why its cessions in the 1831 and 1836 treaties of the islands in the Fox River, in Green Bay and in Lake Winnebago are not evidence of an intent to convey its aboriginal rights in and to the waters. *See Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918) (grant *to* tribe of "body of lands known as Annette Islands" included adjacent fishing grounds).

## 2. *Count IV—treaty-reserved aboriginal rights in waters of Green Bay*

As grounds for its claim in count IV, plaintiff argues that the 1831 treaty recognized the tribe's reserved usufructuary right to hunt and fish in Green Bay. Defendants concede that this is correct. The 1831 treaty's reservation of the tribe's right to hunt and fish in the territory east of the Fox River would have included the waters of Green Bay. Defendants contend, however, that plaintiff's right to fish and hunt ended with the terminating event specified in the treaty: the surveying of the land and offering it for sale. Plaintiff repeats the argument it made with respect to its treaty-reserved usufructuary rights in part C, *supra:* the federal government never extinguished these rights explicitly as required under *Menominee Tribe,* 391 U.S. at 412–13, 88 S.Ct. at 1710–11, and *Lac Courte Oreilles,* 700 F.2d 341. Therefore, plaintiff asserts,

the Menominee retain usufructuary rights in the waters of Green Bay. Resolution of this argument will have to await resolution of the basic question: whether plaintiff is bound by the plain meaning of the 1831 treaty or whether it can show that its understanding was different.

Plaintiff makes an additional argument. Citing *United States v. Michigan,* 471 F.Supp. 192, and *People v. LeBlanc,* 399 Mich. 31, 248 N.W.2d 199 (1976), plaintiff argues that insofar as limitations in treaties purport to relate to lands, they do not apply to waters. In other words, plaintiff contends that even if it agreed that its usufructuary rights in the land would come to an end when the land was surveyed and offered for settlement, such a concession would not affect its rights in the lakes because the water was not needed for settlement. In the two Michigan cases, both the state and federal courts agreed that the Chippewa and Ottawa tribes had not relinquished their aboriginal rights to catch fish in the Great Lakes when they ceded vast amounts of land to the United States in 1836. The federal district court found that the United States had not negotiated for the Indians' right to fish off-reservation in the ceded areas. *Michigan,* 471 F.Supp. at 278–79. The court relied on the language in the treaty that provided for the reservation of the Chippewa's usufructuary rights "until the land is required for settlement," agreeing with the state supreme court that this language would not have been understood by the Chippewa to refer to the waters of the Great Lakes because "the ceded water areas of the Great Lakes have obviously not been required for settlement, and therefore the fishing rights reserved by the Chippewa in those areas have not been terminated." *Id.* at 259 (citing *People v. LeBlanc,* 399 Mich. at 48, 248 N.W.2d at 207).

Although these Michigan cases do not support a general proposition that limitations in treaties that appear to relate to lands can never apply to waters, they suggest that a more complete record must be developed before it will be possible to determine exactly what the Menominee understood when they executed treaties with the government.

Whether the smaller lakes and rivers in the Menominee's ceded territory would have been required for settlement and whether the Menominee understood that they retained usufructuary rights in these waters are factual issues to be determined on a more extensive record.

### 3. *Count V—aboriginal rights to portions of the Wisconsin River*

In count V, plaintiff contends that when it ceded a strip of land along the Wisconsin River, 48 miles long and three miles wide on each side of the river, it retained its aboriginal right to use the river; this aboriginal right was recognized implicitly by the federal government by its acceptance of the cession and has never been extinguished. At this stage of the litigation I cannot say that plaintiff could not succeed on this claim. I note, however, that although plaintiff does not dispute that this area was used traditionally by the Chippewa for hunting and fishing, it does not explain why it can assert a claim of aboriginal use rights. Ordinarily, aboriginal title requires a showing of exclusive use. Plaintiff cites *Strong v. United States,* 518 F.2d 556, 561, 207 Ct.Cl. 254 (1975), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975), for the proposition that in rare situations, a showing of "joint and amicable" possession of the same land can overcome the usual rule. The standard for joint and amicable possession seems to be a high one: the Court of Claims says that the relationship of Indian groups that would qualify for treatment under "joint and amicable" occupancy must be "extremely close," such as that in *Sac & Fox Tribe v. United States,* 383 F.2d 991, 179 Ct.Cl. 8 (1967), where the Fox and Sac were deemed to have such a close relationship as to constitute a merger of the previously existing tribal entities. *Strong,* 518 F.2d at 562. To prevail on this claim that it has an aboriginal usufructuary right in the area along the Wisconsin River, plaintiff will have to make the threshold showing that it had joint and amicable possession of this land with the Chippewa.

### E. *Judicial Estoppel*

 Plaintiff bases five of its six claims in this suit on the contention that it never lost either its reserved usufructuary rights in the lands it ceded to the United States or its aboriginal hunting and fishing rights in certain Wisconsin waters. Defendant contends that the tribe has taken a contrary position in other proceedings, bringing into play the doctrine of judicial estoppel, which prevents parties from repudiating positions on which they prevailed in previous proceedings. *Continental Illinois Corp. v. Commissioner of Internal Revenue,* 998 F.2d 513, 518 (7th Cir.1993). The idea is that a party can argue inconsistent positions in the alternative, "but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory." *Id. See also, Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895) (after party has succeeded on one claim in a legal proceeding, he cannot assume a contrary position simply because his interests may have changed). The application of the doctrine does not require the entry of a judicial opinion adopting the litigant's position; a settlement favorable to the litigant can suffice. *Kale v. Obuchowski,* 985 F.2d 360, 361–62 (7th Cir.1993). The doctrine is equitable in nature and should not be applied when the former position was the result of inadvertence or mistake or where there is only an appearance of inconsistency between the two positions. *Matter of Cassidy,* 892 F.2d 637, 642 (7th Cir.1990).

Plaintiff has filed a number of suits for compensation for the lands it ceded in the nineteenth century and the associated rights it ceded or lost. It brought suit in 1938 before the Court of Claims for the recovery of money for the federal government's conveyance of portions of reservation land to the state of Wisconsin under the Swamp Lands Act of 1850, 43 U.S.C. § 981–994. *Menominee Tribe of Indians v. United States,* 95 Ct.Cl. 232, 1941 WL 4504 (1941). Plaintiff sought the acquisition costs of swamp lands located within the borders of its reservation and the value of the timber removed from such lands. The suit was brought pursuant to a special Act of Congress, 49 Stat. 1085, as amended, 52 Stat. 208, that conferred jurisdiction upon the Court of Claims to determine all legal or equitable claims plaintiff might have against the United States growing out of treaties, agreements, laws of Congress or wrongful handling of the land, timber or other property of plaintiff. Included in the claims that could be brought was a claim for damages for swamp lands that should have been conveyed to the Menominee by the treaty of 1854, but were not because of a previous conveyance to the state of Wisconsin, pursuant to the 1850 Swamp Lands Act. *Id.* Under that act, the federal government had conveyed to the states in praesenti grants of swamp lands located within their borders, even if the location of the swamp lands had not been determined. *Id.* In 1854, when the United States granted plaintiff its reservation, it did not advise plaintiff that the swamp lands were not included in the grant because they had been conveyed earlier to the new state of Wisconsin. *Id.* In holding that the tribe was entitled to recover from the United States the acquisition costs of the lands, the Court of Claims found that

> [t]he basis, the background, the previous history, and the negotiations leading up to the [1854] treaty show that the Indians were desirous of securing hunting lands and that the swamp lands were particularly suited for this purpose, being filled with all kinds of game.

> \* \* \* \* \* \*

> . . . [A] part of the inducement for the moving of the Indians from their former home to their new home, and one of the reasons for entering into the new [1854] treaty was the fact that the tract in question contains swamp lands which were suitable for hunting.

95 Ct.Cl. at 240–41. In a subsequent order, the court entered judgment for plaintiff in the sum of $1,781,282.91, of which $13,666.80 represented the value of the timber removed from the reservation and the remainder represented the acquisition cost to the tribe of swamp lands located within the boundaries of the reservation. *Menominee Tribe of Indians v. United States,* 101 Ct.Cl. 863 (1944).

On June 26, 1951, plaintiff filed a petition before the Indian Claims Commission, which had been created in 1946, 25 U.S.C. §§ 70, 70v–3 (repealed 1978, 25 U.S.C. § 70v (1983)), to provide a forum for Indian claims against the United States. The commission was intended to replace the cumbersome process under which the Menominee had sued in 1938, which required them to petition Congress for special legislation authorizing suit against the United States. In large part, the impetus for the commission was Congress's desire to find a means of providing moral redress for past wrongs done to the Indians and a legal settling of obligations. David H. Getches et al., *Federal Indian Law* 311 (3d ed.1993).

In its 1951 petition to the Indian Claims Commission, plaintiff asserted that in treaties signed in 1831, 1836, 1848 and 1854, it had given up to the United States *"all its right, title and interest in and to"* the tracts of land it ceded in each treaty, that it had done so for inadequate and unconscionable consideration and that it was entitled under the law to just compensation for the lands so relinquished. Menominee Petition at 2, 5, 7 and 9, Defs.' App. at 257, 258, 259, 260. On July 10, 1951, approximately two weeks after it filed its petition with the Indian Claims Commission, plaintiff entered into a stipulation settling all of its claims with the United States, "including land claims arising under the Treaties of February 8, 1831, September 3, 1836, October 18, 1848 and May 12, 1854," for $8,500,000. Stipulation, Defs.' App. at 241–42. A memorandum report to the Court of Claims indicates that the claims asserted by plaintiff and included in the settlement related to claims asserted in seven different proceedings before the court, covering such matters as the federal government's failure to handle trust funds properly or pay interest on certain funds. It says nothing about any land claims. Defs.' App. at 247–50.

In 1965, plaintiff sued the United States in the Court of Claims again, *see Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, seeking compensation for the reserved hunting and fishing rights it had lost when it sought and obtained termination of its reservation status under the Menominee Indian Termination Act of 1954 and the Supreme Court of Wisconsin had ruled that passage of the act extinguished the tribe's hunting and fishing rights on its old reservation. *Sanapaw,* 21 Wis.2d 377, 124 N.W.2d 41. Believing that the loss of its guaranteed hunting and fishing rights was compensable, the tribe brought suit in the Court of Claims, which denied plaintiff's claim because it found that passage of the act had *not* extinguished the tribe's usufructuary rights. *Menominee Tribe v. United States,* 388 F.2d 998, 179 Ct.Cl. 496 (1967). In the Court of Claims' analysis, the Wisconsin supreme court had erred in reading the provision in the Termination Act that "the laws of the [state] shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction," 25 U.S.C. § 899, as giving Wisconsin the authority to regulate the Menominee's hunting and fishing within their old reservation. *Menominee Tribe,* 388 F.2d at 1004. This reading would conflict with the language in the Menominee amendment to Public Law 280, 18 U.S.C. § 1162, which was passed seven years before the Termination Act and provided explicitly for the protection of tribal rights and immunities with respect to hunting and fishing. *Id.* Furthermore, according to the Court of Claims, it was unnecessary to say anything in the Termination Act about the preservation of exclusive hunting and fishing rights because the act called for the tribe to submit a plan for the protection of fish and wildlife. There would have been no reason for such a plan if Congress had intended the state to be responsible for Menominee hunting and fishing. *Id.* at 1006.

Faced with the inconsistent holdings of the Supreme Court of Wisconsin and the Court of Claims, the United States Supreme Court granted certiorari and affirmed the ruling of the Court of Claims on slightly different grounds. *Menominee Tribe,* 391 U.S. 404, 88 S.Ct. 1705. The Supreme Court agreed with the Court of Claims that the Menominee had been guaranteed hunting and fishing rights on its reservation under the 1854 treaty. With that finding, it followed that the tribe would be eligible for compensation for the value of those rights if the Termination Act had abrogated them. However, the act had

not had that effect because Congress would not have subjected the United States to a claim for compensation by destroying treaty-conferred property rights without making its intention explicit in the legislation. "We decline to construe the Termination Act as a back-handed way of abrogating the hunting and fishing rights of these Indians." *Id.* at 412, 88 S.Ct. at 1710.

In the 1965 case before the Court of Claims, plaintiff represented that it had obtained the on-reservation rights under the 1854 treaty as a replacement for the special hunting and fishing rights it had exercised on the lands it ceded to the United States in the 1848 treaty. In a memorandum in support of its claim for compensation for the lost on-reservation rights or in the alternative for a declaration that it had retained its exclusive on-reservation hunting and fishing rights, plaintiff's counsel cited the state supreme court's observation in *Sanapaw*, 21 Wis.2d at 383, 124 N.W.2d at 44, that it was "unlikely that the Menominee would have knowingly relinquished their special fishing and hunting rights which they enjoyed on their own lands, and have accepted in exchange other lands with respect to which such rights did not extend." Menominee Memorandum at 17, Defs.' App. at 194. In addition, counsel cited at two different places the language from the opinion of the Court of Claims in the earlier Swamp Lands case, *Menominee Tribe*, 95 Ct.Cl. 232, to the effect that the tribe was desirous of securing hunting lands, that it viewed the swamp lands as particularly suited for this purpose and that the inclusion of the swamp lands in the reservation was an inducement for moving to the reservation. Menominee Memorandum at 6, 18, Defs.' App. at 183, 195.

█ In an effort to avoid the effect of the doctrine of judicial estoppel, plaintiff argues that none of its litigation before the Court of Claims or the Indian Claims Commission had anything to do with the injunctive and declaratory relief it is seeking in this case and therefore, it had no reason to raise the issue of its reserved usufructuary rights in those proceedings. This argument misses the mark. The question is not whether the same issue is in dispute but whether the party to

be estopped took a position directly contrary to the one it now asserts, under circumstances in which it necessarily repudiated the present position by its assertion of the prior one, *and* whether it prevailed on that position.

█ I am not persuaded that plaintiff can be judicially estopped from bringing the present litigation because of its assertion in the 1965 litigation before the Court of Claims and later before the Supreme Court that it had lost all right, title and interest in the ceded lands. A fair reading of the opinions of both courts shows that plaintiff did not succeed in "selling" that position to either court. Both courts based their decisions on other grounds. The Supreme Court expressly disavowed any interest in determining the exact nature of the rights conveyed to the tribe. However, my view is different with respect to the 1951 proceeding before the Indian Claims Commission in which plaintiff represented that it had lost "all its right, title and interest in and to" the ceded lands. That position appears to be directly contrary to its position in this suit, which is that it did not lose *all* right and interest but retained usufructuary rights on those lands. The prior position does not appear to be the consequence of inadvertence, lack of understanding or naivete in legal affairs. Plaintiff was represented by counsel throughout all those proceedings. Moreover, the assertions and the circumstances in which the statements are made are of such a nature that a person making one assertion would have to know he was repudiating the other.

Plaintiff states in its brief that the main work of the Indian Claims Commission was resolving claims arising out of disputes over land. Apparently, this statement, together with plaintiff's citation to *Mille Lacs Band of Chippewa Indians v. Minnesota*, 853 F.Supp. 1118 (D.Minn.1994), are intended as an assertion that the commission would have viewed its petition and its briefs before the commission as limited to claims arising out of land it ceded and land that should have been conveyed to it and not as involving any claims relating to the loss of usufructuary rights. The assertion is unpersuasive in light of plaintiff's concession that the commission's

jurisdiction was not limited to land claims. Furthermore, plaintiff's statement in its petition referred to "all right, title and interest in and to" its lands in Wisconsin. Such broad language has been held to encompass fishing and hunting rights when used in a treaty, *Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766, 105 S.Ct. 3420, 3428, 87 L.Ed.2d 542 (1985), and it is the logical reading of the petition drafted by counsel for plaintiff.

Plaintiff describes the *Mille Lacs* case as "strikingly similar" to its own as it relates to defendants' contention that plaintiff's proceedings before the Indian Claims Commission bar it from asserting its retained usufructuary rights in this case. Like this case, *Mille Lacs* involved reserved usufructuary rights. The state of Minnesota argued that the band could not prosecute its claim in federal court because it was barred by prior proceedings before the Indian Claims Commission and the Court of Claims. According to the state, further litigation was barred for two reasons: 1) the principle of claim preclusion, which bars relitigation of matters previously litigated; and 2) the Indian Claims Commission Act, which was intended by Congress to provide an exclusive remedy in the Indian Claims Commission. The state contended that once the time for bringing claims before the commission had elapsed, Indian tribes were foreclosed from suing on claims arising out of treaties with the federal government.

The district court was not persuaded that principles of issue and claim preclusion should apply. First, the question of off-reservation usufructuary rights had not been raised in the prior proceedings and was not necessary to their outcome. *Mille Lacs*, 853 F.Supp. at 1137. Second, as to the state's argument about the exclusive forum offered by the Indian Claims Commission, the court concluded that plaintiff was not required to have raised its claim to the continued existence of its usufructuary rights in the commission because the commission's jurisdiction was limited to providing damages for extinguished title, whereas the tribe's federal court claim was for damages from *present* violations of its off-reservation rights. In the

court's view, plaintiff's claim would not have accrued until long after the commission had gone out of existence.

It does not appear that the question of judicial estoppel was raised in the *Mille Lacs Band* case. Therefore, I cannot say that the case supports plaintiff's position and I cannot infer from the case what plaintiff's argument is in opposition to defendants' assertion of the doctrine of judicial estoppel. In the next section, I take up the issue of claim preclusion that the *Mille Lacs* opinion does discuss.

The final question is whether Indian tribes are exempt from the application of equitable doctrines such as judicial estoppel. In *Oneida v. Oneida Indian Nation*, 470 U.S. 226, 244 and n. 16, 105 S.Ct. 1245, 1256–57 and n. 16, 84 L.Ed.2d 169 (1985), the Supreme Court suggested that the equitable doctrine of laches would not extinguish Indian title. The Court found that the issue had been waived and was not properly before it, but it quoted *Ewert v. Bluejacket*, 259 U.S. 129, 138, 42 S.Ct. 442, 444, 66 L.Ed. 858 (1922), to the effect that the equitable doctrine of laches "cannot possibly have application to give vitality to a void deed and to bar the rights of Indian wards in lands subject to statutory restrictions." In addition, the Court noted that such an extinguishment "requires a sovereign act." *Id.*

Despite the broad language the Court used in the *Oneida* case, it is doubtful that the Court would apply the same reasoning to the equitable defense of judicial estoppel as it is raised in this case. Unlike laches, which is intended "to protect good faith transactions against those who have slept on their rights," *Oneida*, 470 U.S. at 244 n. 16, 105 S.Ct. at 1256–57 n. 16, the doctrine of judicial estoppel works to bar subsequent law suits by persons who have acted purposefully and have knowingly asserted a particular position. Far from sleeping on its rights, plaintiff asserted them actively, intentionally and knowingly. Plaintiff initiated all of the proceedings at issue and did so with the assistance of counsel. Finally, unlike the County of Oneida, which raised the defense of laches in the *Oneida* case in an effort to show that the tribe's rights had been extinguished, defendants do not raise the doctrine of judicial

estoppel for that purpose. Rather, they raise it as evidence both that plaintiff has known all along that it did not retain the rights it now asserts and that it has been compensated for the rights it bargained away.

Although defendants have made a strong case for applying the doctrine of judicial estoppel to bar the litigation of plaintiff's claims involving its retained usufructuary rights, there remain factual questions regarding the interplay of plaintiff's 1951 petition to the Indian Claims Commission and the subsequent stipulated Court of Claims settlement. It is not clear from the present record whether the settlement included the claims raised in the petition or was limited to the miscellaneous claims that were pending before the Court of Claims when the petition was filed. The 1951 Court of Claims order stated that plaintiff and the United States had compromised and settled their differences with respect to seven Court of Claims cases and "other liabilities," but did not say explicitly that the settlement award was intended to compensate the Menominee for the claim they had filed with the Indian Claims Commission. Defts.' App. at 243–245. Nevertheless, in April 1952, plaintiff moved to dismiss its case before the Indian Claims Commission with prejudice. Earlier, in a December 10, 1951 letter, the Attorney General had advised the chief clerk of the Indian Claims Commission that the United States and the Menominee had executed a stipulation and joint motion to dismiss the pending claims commission proceedings. Defts.' App. at 264. It appears that this reference is to the settlement of the Menominee litigation in the Court of Claims, but I cannot say that with certainty from the record now before the court.

The upshot of all of this is that if defendants can show that the Court of Claims settlement incorporated the Indian Claims Commission proceeding, it would follow that plaintiff prevailed on the position it took before the commission, which was that it had lost all right, title and interest in and to the lands it had ceded by treaty. In that case, plaintiff would be prevented by the operation of the doctrine of judicial estoppel from asserting in this court the contrary position that it still retained rights and interests in the ceded lands.

Plaintiff suggests that the language it used in the petition to the Indian Claims Commission should not be read as an assertion that it had lost its treaty-reserved and aboriginal usufructuary rights because it was merely quoting the language in the treaty. It is questionable whether that would make any difference, see Oregon Dept. of Fish and Wildlife, 473 U.S. at 768, 105 S.Ct. at 3429 (normal construction of language in 1901 agreement surrendering "all [tribe's] claim, right, title and interest in and to" portion of reservation would encompass any special right to use ceded lands for hunting and fishing in absence of any language reserving any specific rights in lands), but plaintiff is wrong about the language. The treaties do not use the phrase, "right title and interest." In the 1848 treaty, the Menominee ceded and relinquished "all their lands." The treaty contains no reference to "right, title and interest." This language originated with plaintiff's counsel and appears to have been used to persuade the Indian Claims Commission of the scope and extent of the tribe's loss.

At this point, however, I will deny defendants' motion to dismiss counts I–V on the ground of judicial estoppel because I am not prepared to make the necessary factual findings without further development of the record.

## H. *Issue Preclusion*

In asserting that plaintiff's claims are barred by the doctrine of issue preclusion, defendants are no longer focusing on the positions plaintiff has taken in prior litigation but on the ruling made by the United States Supreme Court in Menominee Tribe, 391 U.S. 404, 88 S.Ct. 1705. Defendants contend that the Court held explicitly that the Menominee received on-reservation rights to hunt and fish in a quid pro quo exchange for their loss of all their off-reservation rights and because this finding was essential to the Court's decision, plaintiff is barred from contending that it did not lose all its off-reservation rights. Plaintiff argues that the only "finding" the Court made was to adopt the

conclusion of the Supreme Court of Wisconsin that the rights the Menominee exercised on their reservation were the same as those that Indians in general would exercise on lands never ceded to the government.

 "Claim preclusion" bars multiple suits against the same parties on the same claims. It protects against repetitive suits and operates to bar further litigation of all issues relevant to the same claim between the same parties, whether raised at trial or not. 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4402 at 7 (1981) (quoting *Kaspar Wire Works, Inc. v. Leco Engineering & Machinery, Inc.*, 575 F.2d 530, 535–36 (5th Cir.1978)). (Defendants made a reference to claim preclusion in their brief but they are not basing their argument on it.) "Issue preclusion" bars relitigation between the same parties of issues actually adjudicated and essential to the judgment in a prior litigation. *Id.* Defendants rely on "nonmutual issue preclusion," which is a special aspect of preclusion that bars a party who has had one fair trial on an issue from going to trial on the merits of that issue a second time, even against a different defendant. *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 324, 91 S.Ct. 1434, 1440, 28 L.Ed.2d 788 (1971). *See also* Wright, *supra*, § 4464 at 571. Nonmutual issue preclusion is warranted by the public policy of limiting litigation. *Id.* To invoke nonmutual issue preclusion, the party asserting it must show that its opponent is the same party that first went to trial on the issue, the issue is the same, the issue was resolved by a final judgment on the merits and the party against whom it is invoked had a full and fair opportunity to litigate the issue in the first action. *Id.* Only the third of these requirements is in dispute here: whether the issue was resolved in the prior suit.

The parties agree that in order to determine whether the Menominee retained exclusive hunting and fishing rights on their reservation free from the state's game laws, both the state supreme court and the United States Supreme Court had to make a preliminary determination whether the tribe was granted hunting and fishing rights free from state regulation on its new reservation when it was created in 1854. The treaty itself made no specific reference to any such rights but simply ceded the lands to the Menominee "to be held as Indian lands are held." The Wisconsin supreme court found this phrase ambiguous. *Sanapaw*, 21 Wis.2d at 382, 124 N.W.2d at 44. "One possible interpretation" of the phrase would be "that the Menominee would enjoy the same rights with respect to lands owned and occupied by them which have never been ceded by treaty" and that these rights would include the right to hunt free from state game laws. *Id.* The court found this to be the logical meaning of the phrase, following the rule of construction that ambiguous phrases are to be interpreted in favor of the Indians and because "[i]t would seem unlikely that the Menominees would have knowingly relinquished their special fishing and hunting rights which they enjoyed on their own lands, and have accepted in exchange other lands with respect to which such rights did not extend." *Id.* at 383, 124 N.W.2d at 44. The state supreme court concluded, however, that the Termination Act of 1954 had put an end to the tribe's exclusive hunting and fishing rights.

 In resolving the conflict between the contradictory holdings of the Court of Claims and the Supreme Court of Wisconsin, the United States Supreme Court found it unnecessary to decide the precise nature and extent of the hunting and fishing rights the Menominee enjoyed before termination. Instead, it simply adopted the view of the Court of Claims that the phrase, "to be held as Indian lands are held" includes the right to fish and to hunt free of state regulation. *Menominee Tribe*, 391 U.S. at 406, 88 S.Ct. at 1707 (citing *Menominee Tribe*, 388 F.2d at 1002). As the Supreme Court saw it, the only issue to be decided was whether "those rights, whatever their precise extent, have been extinguished." *Id.* at 407, 88 S.Ct. at 1708.

Because the United States Supreme Court refused to delineate the extent of the rights enjoyed by the Menominee before the passage of the Termination Act, its holding cannot be read as a factual finding that those

rights existed as the consequence of a quid pro quo exchange, as defendants maintain. Although the Court quoted the state supreme court's observation that it was unlikely the tribe would have given up the special fishing and hunting rights it enjoyed on its own lands in return for a reservation without such rights, it did so only in a footnote. Defendants characterize the finding as essential to the Court's decision but it was not. The Court could well have based its decision on the simple finding that the use of the term, "to be held as Indian lands are held," conveys exclusive hunting and fishing rights on a reservation, regardless what is exchanged for the grant. Consequently, I am not persuaded that plaintiff's claims in this suit are foreclosed by the doctrine of nonmutual issue preclusion.

## I. Treaty Right to Taking of Sturgeon—Count VI

In count VI, plaintiff alleges that the 1854 treaty reserved the sturgeon resource of the reservation for the exclusive right of the tribe. Plaintiff contends that because man-made obstructions prevent the sturgeon from getting to the reservation so that the tribe can harvest them, equitable arrangements should be made to enable plaintiff's members to take at least 50% of the available off-reservation sturgeon that would reach the reservation but for the obstructions. Plaintiff would agree to a smaller harvest if that is all that is necessary to allow tribal members to attain a moderate standard of living. This claim is entirely independent of the other five claims in which plaintiff contends that it retains rights to fish, hunt and gather off-reservation. Plaintiff may have special rights to the sturgeon that it can exercise even if it has no reserved or aboriginal off-reservation hunting and fishing rights. On the other hand, if plaintiff is correct that it has off-reservation usufructuary rights, it will be irrelevant whether the tribe should be allowed to take sturgeon downstream of the reservation because at least some downstream harvesting would be encompassed by the off-reservation usufructuary rights.

Defendants take issue with the central premise of plaintiff's claim that the 1854 treaty guaranteed the tribe an on-reservation harvest of sturgeon. In addition, they dispute the legality of the tribe's proposed remedy, saying that it would exceed the outer limits of this court's equitable powers. They characterize the proposal as a rewriting of the treaty language and an expansion of the geographic scope of the area in which the tribe could exercise its usufructuary rights, both of which are actions that may be taken only by Congress and not by the courts.

■ I agree with plaintiff that at this stage of the litigation it is not possible to say how plaintiff's leaders understood the 1854 treaty as it related to the sturgeon resource. Plaintiff may be able to show that the sturgeon is central to the economic, social, cultural and spiritual life of the Menominee, see David R.M. Beck, Return to Namä'o Uskiwämit: The Importance of Sturgeon in Menominee Indian History, 70 Wisconsin Magazine of History at 37 (1995) (sturgeon receive frequent mention in Menominee mythology, where they are linked to tribe's origins, and they play a significant role in tribe's physical and spiritual sustenance). Plaintiff may be able to show also that the tribe would have understood any grant of reservation lands "to be held as Indian lands are held" as including continued access to the sturgeon resource. See Menominee Tribe, 391 U.S. at 406, 88 S.Ct. at 1707 ("[T]he language 'to be held as Indian lands are held' includes the right to fish and to hunt.... The essence of the [1854] Treaty ... was that the Indians were authorized to maintain on the new lands ceded to them as a reservation their way of life which included hunting and fishing.") I will assume without deciding that the Menominee may have believed that they could not maintain their way of life if they were deprived of the sturgeon resource, although I recognize that defendants have some support for their argument that the United States never intended to guarantee the Menominee a sturgeon harvest on their reservation.

■ It makes no difference whether plaintiff does or does not have a right to a sturgeon harvest because it has shown no legal basis for the remedy it seeks for the claimed deprivation of that right, that is, an equitable adjustment to allow tribal members

to fish for sturgeon off-reservation free of state regulation. Such a remedy would amount to an impermissible rewriting of the treaty. "Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice." *Choctaw Nation of Indians,* 318 U.S. at 432, 63 S.Ct. at 678.

Plaintiff describes its request as similar to those of tribes who have sued successfully for equitable allocations of harvests to protect their treaty-reserved off-reservation fishing rights. Plaintiff cites *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, as an example of a case in which the Supreme Court directed a lower court to make an adjustment in the fish harvest in order to protect the fishing rights of a tribe from the effects of "fish wheels" used by non-Indian fishers downstream of the tribe's usual and accustomed fishing spots. Without such an adjustment, the fish wheels would have captured the entire run of fish, thereby preventing the tribe from exercising its usufructuary right under an 1859 treaty securing its right to take fish at all its usual and accustomed places in common with citizens of the territory. In addition, plaintiff cites *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), a case in which the Supreme Court held that when a state was allocating a shared fishery resource between tribal and non-tribal fishers, it could take into account the on-reservation harvest, so as to prevent the treaty fishers from taking "the last living steelhead" and frustrating the rights of non-Indian fishers who had an "in-common" right to the resource.

Plaintiff argues that *Winans* shows that the courts can limit the harvest of non-Indian fishers in order to protect treaty fishing. By extrapolation, plaintiff maintains, this court can make an equitable adjustment in the sturgeon harvest to enable the tribe to harvest up to 50% of the available sturgeon that would reach the reservation. "[The] anadromous habits [of the sturgeon] render it a resource that must of necessity be shared with non-Indians downstream and off the reservation. Under these circumstances, at a minimum the Tribe is entitled to harvest up

to 50% of the available sturgeon run that would reach the reservation." Pl.'s Brief, dkt. # 25, at 71–72. According to plaintiff, it follows from *Puyallup* that if a court is allowed to reach onto a reservation to make an equitable adjustment for the benefit of the Indian and non-Indian shared fishery, this court can reach off the reservation to protect the rights of the Menominee.

Plaintiff places special emphasis on the Northwest fishing cases, such as *Puyallup,* as well as *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), which involve reserved treaty rights for the off-reservation exercise of usufructuary rights in common with non-Indian citizens. Plaintiff's case is of a different kind. The right it claims to an off-reservation sturgeon harvest does not rest on a reserved treaty right to go off-reservation to harvest sturgeon. Nothing in the 1854 treaty gave plaintiff any right to hunt or fish off-reservation. The treaty gave plaintiff only the right to hunt and fish on its own reservation free of state regulation. Thus, plaintiff's requested remedy is not like the remedies in the Northwest cases, in which the courts ordered steps be taken to protect the off-reservation fishing rights that had been reserved to the Indians. Plaintiff is asking for a reformation of the treaty to give it a right it was not granted under the treaty: the right to go off-reservation to exercise fishing rights. Plaintiff cannot argue that it reserved any such right because the 1854 treaty was not a grant *from* the tribe, as were the earlier treaties, but a grant *to* the tribe.

The interference with plaintiff's harvest comes not from other fishers but from the encroachment of industry, commerce and residential development that are the accompaniments of the westward expansion of European settlement and economic growth. In this respect, this case is like cases in which other tribes have sought to articulate a right to an environmental servitude that would require states to protect fishing habitats from environmental degradation. Although a number of commentators have advanced the idea that such a right should be recognized in order to protect treaty fishing

rights, *see*, *e.g.*, Gary D. Meyers, *United States v. Washington (Phase II) Revisited: Establishing an Environmental Servitude Protecting Treaty Fishing Rights*, 67 Or. L.Rev. 711 (1988); Thomas C. Galligan, Jr. & Michael T. Reynvaan, Comment, *Pacific Northwest Indian Treaty Fishing Rights*, U.Puget Sound L.Rev. 99 (1981), the concept has not fared well in the courts. It found acceptance by the district court in *United States v. Washington (Phase II)*, 506 F.Supp. 187 (W.D.Wash.1980) (tribes' right to take fish included right to have treaty fishing habitat protected from environmental degradation), but not in the Court of Appeals for the Ninth Circuit, which overturned the district court's decision on appeal. *United States v. Washington*, 694 F.2d 1374, 1375 (9th Cir.1982); *vacated on other grounds*, *United States v. Washington*, 759 F.2d 1353, 1356–60 (9th Cir.1985) (en banc) (contrary to sound judicial discretion for district court to declare that right to take fish incorporates right to have treaty fish protected from man-made despoliation), *cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985). In a recent case in Idaho, *Nez Perce Tribe v. Idaho Power Co.*, 847 F.Supp. 791, 804–810 (D.Idaho 1994), the district court dismissed a tribe's action for money damages against the Idaho Power Company for the negative effect its Snake River dams had on the chinook and steelhead runs.

Courts have limited the protection of Indian fishing rights to regulation of non-Indian fishers. In the Northwest cases and in the *Lac Courte Oreilles* litigation, the tribes prevailed when they requested that defendant state officials be required to impose limitations on the non-Indian fishers they regulated in order to ensure that treaty fishers could obtain their fair share of the treaty-protected harvest. The tribes were not asking for fishing rights at locations other than the usual and customary places reserved for them by treaty or seeking to extend the geographical boundaries of the treaty-protected harvest area.

Making adjustments in the manner of harvesting off-reservation to ensure that both Indians and non-Indians have a fair share of the harvest is not the same as saying that tribal members may have access to state-regulated off-reservation areas to harvest a particular resource. I am aware of no case in which a court has ever granted an off-reservation harvesting right to make up for lost fishing or hunting opportunities on a reservation. The usual recourse for a tribe that claims the loss of a guaranteed usufructuary right is either to seek monetary compensation for the lost opportunity from Congress, the Court of Claims or the now-defunct Indian Claims Commission or to sue for an injunction preventing the construction of a dam or other obstruction or requiring that it be removed. *See*, *e.g.*, *Confederated Tribes of Umatilla Indian Reservation v. Alexander*, 440 F.Supp. 553 (D.Or. 1977) (in suit to prevent construction of specific dam on ground it would deprive Indians of right to occupy fishing stations and prevent fish from swimming upstream, court found no authority for construction of dam in statute because statute did not show clear intent by Congress to abrogate treaty rights).

I conclude that plaintiff has not stated a claim in count VI on which relief could be granted in the requested form.

## SUMMARY

Although plaintiff has not explained how it can show that the apparently clear language of the treaties into which it entered did not operate to terminate all of its rights, title and interest to its lands in the state of Wisconsin, including its usufructuary rights, it will be given the opportunity to make that showing and to develop the factual record in support of its contentions that the treaties are ambiguous and should be read as granting plaintiff usufructuary rights of indefinite duration. In addition, the parties will have an opportunity to clarify the record with respect to the prior proceedings before the Court of Claims and the Indian Claims Commission.

## ORDER

IT IS ORDERED that the motion to dismiss of defendants Tommy G. Thompson, George E. Meyer, James T. Addis, John E. Fryatt, Herbert F. Behnke, Trygbe A. Solberg, Neal W. Schneider, Betty Jo Nelsen,

Mary Jane Nelson, James E. Tiefenthaler, Jr., and Stephen D. Willett is GRANTED with respect to plaintiff's claim in count VI that it is entitled to go off-reservation to harvest sturgeon. In all other respects, defendants' motion is DENIED.